1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7

8
MICHAEL BUTLER, et al.,
9
                Plaintiffs,                    No. C 04-0135 PJH
10
        v.                                     **ORDER RE CROSS-MOTIONS**
11                                             **FOR SUMMARY JUDGMENT**
ADOPTION MEDIA, LLC, et al.,
12
                Defendants.
13      _____/

14         The parties' cross-motions for summary judgment came on for hearing on June 7,

15   2006.  In July 2006, the California Supreme Court issued three decisions relevant to issues

16   raised in the parties' motions:  Kearney v. Salomon Smith Barney, Inc., 39 Cal. 4th 95

17   (2006); Californians for Disability Rights v. Mervyns, LLC, 39 Cal. 4th 223 (2006); and

18   Branick v. Downey Sav. & Loan Ass'n, 39 Cal. 4th 235 (2006).  The court subsequently

19   instructed the parties to submit further briefing addressing those decisions.

20         Having read the parties' papers and carefully considered their arguments and the

21   relevant legal authority, and good cause appearing, the court hereby DENIES plaintiffs'

22   motion and GRANTS defendants' motions IN PART and DENIES them IN PART, as

23   follows.

24                              **INTRODUCTION**

25         Defendants Dale R. Gwilliam and Nathan W. Gwilliam ("the Gwilliams") are Arizona

26   residents who run businesses that operate adoption-related websites.  These websites

27   constitute the largest, most active, and most well-known Internet adoption-related business

28   in the United States.  One of the websites, ParentProfiles.com, offers a service that allows

**United States District Court**
For the Northern District of California

1  prospective adoptive parents, for a fee, to post "profiles" containing information about
2  themselves, for review by women who have given birth or are about to give birth and plan
3  to give up the children for adoption.

4      Plaintiffs Michael Butler and Richard Butler ("the Butlers") have been registered
5  domestic partners in the state of California since 2000.  In 2002, they were seeking to
6  adopt a child.  They were certified and approved to adopt in California, and applied to have
7  their profile posted on ParentProfiles.com.  Their application was rejected.

8      On January 12, 2004, plaintiffs filed suit against the Gwilliams and two Arizona
9  limited liability companies owned and managed by the Gwilliams – Adoption Media LLC
10 and Adoption Profiles LLC.  Plaintiffs alleged violations of the Unruh Civil Rights Act ("the
11 Unruh Act" or "the Act"), California Civil Code §§ 51 and 51.5; and violations of California's
12 unfair competition and false advertising laws, California Business and Professions Code
13 §§ 17200 and 17500.  Plaintiffs subsequently amended the complaint to add three
14 defendants – Adoption.com, True North, Inc., and Aracaju, Inc. – and to allege alter ego
15 and successor liability.  Plaintiffs amended the complaint a second time following the
16 court's ruling on the motion to dismiss the first amended complaint.  Plaintiffs seek
17 damages and injunctive relief.

18     Each side has moved for summary judgment.  Plaintiffs seek summary judgment on
19 the issue of liability against Dale R. Gwilliam, Nathan W. Gwilliam, Adoption.com, and
20 Adoption Profiles LLC, on the Unruh Act claims.  Defendants seek summary judgment on
21 the substantive causes of action and on the issues of alter ego and successor liability, and
22 personal jurisdiction.  They also argue that the injunctive relief requested would violate the
23 First Amendment, that California substantive law may not be applied in this case, and that
24 plaintiffs lack standing to bring the unfair competition and false advertising claims.

**BACKGROUND**

26     On August 31, 1999, Dale Gwilliam and Nathan Gwilliam formed an Arizona general
27 partnership, known as Adoption.com.  Dale and Nathan each owned, and continue to own,
28 50% of the Adoption.com partnership.

As of October 2002, the Adoption.com partnership owned a network of adoption-related websites, including Adoption.com, a website providing a variety of adoption-related information, and ParentProfiles.com, which allowed prospective adoptive parents to post information about themselves, for a monthly fee.  In addition, in Dale and Nathan formed another general partnership in 2002, Adoption Internet Holdings, and through that partnership purchased a California business, the Adopting.org website.

Plaintiffs were certified and approved to adopt on October 3, 2002.  The Independent Adoption Center ("IAC"), the oldest and largest adoption agency in California, which had a contract with the Adoption.com partnership relating to referrals to the ParentProfiles service, referred plaintiffs to the website, ParentProfiles.com, as part of plaintiffs' search for an adoptable child.

Plaintiffs filled out an application to become members of ParentProfiles.com.  They obtained a log-in identification name and password to access the ParentProfiles website and upload their profile information.  On October 21, 2002, plaintiffs submitted by facsimile copies of the ParentProfiles credit card authorization form and agreement and a certificate of compliance from the IAC.

On October 24, 2002, Michael Butler called Adoption.com's toll-free number to inquire about the status of the application.  He spoke with Dale Gwilliam.  In the course of the conversation, Dale told Michael that plaintiffs would not be permitted to use ParentProfiles.com's services.

The partnership had adopted a policy allowing only individuals in an opposite-sex marriage to post profiles on the website.  Dale testified in his deposition that the "opposite gender component is an essential component of the policy."  Nathan testified that a same-sex couple registered under California's domestic partnership law would not qualify under the policy because they are not married, and that even if same-sex couples were permitted to marry in all 50 states, defendants would still be reluctant to change the policy and would instead "look at all the evidence gathered altogether and make a decision" as to whether to modify their policy.

3

Michael e-mailed the Gwilliams five days later "confirming our conversation we had last Thursday afternoon" in which Dale "stated that it is your policy to not allow domestic partners to sign-up for your site." Michael asked that Dale "reconsider your policy against gay couples and allow us to join your site." The Gwilliams did not respond to the e-mail, and did not have any further direct communication with the plaintiffs. The partnership did not accept plaintiffs' application to use the services of ParentProfiles.com, and refused to post their profile on the website.

On January 2, 2003, the Gwilliams formed two Arizona limited liability companies, Adoption Media LLC and Adoption Profiles LLC. Each of the two LLCs was owned 50-50 by Dale and Nathan. At the formation of the LLCs, each was provided with $200 in cash assets.

On January 9, 2003, Dale and Nathan elected themselves the sole managers and officers of Adoption Media LLC and Adoption Profiles LLC. Nathan is the Chief Executive Officer, and Dale is the President and Secretary, of each LLC. Also on January 9, 2003, Dale and Nathan executed documents transferring most of the partnership assets of Adoption.com (the general partnership) to Dale and Nathan. Those assets included the Adoption.com and ParentProfiles.com domain names and related programming and intellectual property.

Dale and Nathan then transferred ownership of the Adoption.com website to Adoption Media LLC and ownership of the ParentProfiles.com website to Adoption Profiles LLC – all transfers or distributions to be effective as of 11:59:30 p.m. on January 31, 2003. The Adoption.com partnership retained the software used by the websites transferred to the LLCs, and also retained more than 1000 domain names, the operating website, the Adopting.org website, and other associated assets.

On January 15, 2003, Dale and Nathan dissolved the partnership Adoption Internet Holdings, and distributed all its assets, including the Adopting.org website, to the general partners as of 11:59:30 p.m. on January 31, 2003. Dale and Nathan transferred these assets to Adoption Media LLC as of 11:59:35 p.m. on January 31, 2003.

United States District Court

For the Northern District of California

1   On June 2, 2003, Dale and his wife Kristie incorporated True North, Inc. ("True

2   North") as an Arizona corporation; and Nathan incorporated Aracaju, Inc. ("Aracaju") as an

3   Arizona corporation.

4   On June 6, 2003, Dale conveyed his 50% ownership in Adoption Media LLC and

5   Adoption Profiles LLC to True North; and Nathan conveyed his 50% ownership in Adoption

6   Media LLC and Adoption Profiles LLC to Aracaju.  The transfers involved membership only,

7   with no transfer of the underlying assets.  That same day, Dale, as President of True North,

8   designated himself as True North's representative relating to its membership interests in

9   both LLCs; and Nathan as President of Aracaju, designated himself as Aracaju's

10   representative relating to its membership interests in both LLCs.  True North and Aracaju

11   currently act as holding companies of the membership interests in the LLCs.

12   AdoptionProfiles LLC continues the policy of allowing only married, opposite-sex

13   couples to use the ParentProfiles service.

**DISCUSSION**

15   A.   Legal Standard

16   Summary judgment is appropriate when there is no genuine issue as to material

17   facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

18   Material facts are those that might affect the outcome of the case.  Anderson v. Liberty

19   Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

20   is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

21   The court may not weigh the evidence, and is required to view the evidence in the light

22   most favorable to the nonmoving party.  Id.

23   A party seeking summary judgment bears the initial burden of informing the court of

24   the basis for its motion, and of identifying those portions of the pleadings and discovery

25   responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

26   v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

27   at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

28   than for the moving party.  On an issue where the nonmoving party will bear the burden of

**United States District Court**
For the Northern District of California

proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  See id.  If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion.  See    Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

B.      The Unruh Act

The Unruh Civil Rights Act, California Civil Code §§ 51 and 52, was enacted in 1959, although predecessor statutes had been enacted in 1897 and 1905, and the 1905 statute remained in effect until the effective date of the Unruh Act.  See Harris v. Capital Growth Investors XIV, 52 Cal. 3d 1142, 1150-52 (1991).  Civil Code § 51.5 was enacted in 1976.

While it has been amended several times since 1959, Civil Code § 51 has always provided that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their [specified personal characteristics], . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).  Section 51.5 provides, in part, that "[n]o business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51 . . . . " Cal. Civ. Code § 51.5(a).

The "specified personal characteristics" listed in the 1959 version of the Unruh Act were "race, color, religion, ancestry, or national origin."  In 1970, the California Supreme Court applied the Unruh Act to a case involving the exclusion of a patron of a business establishment for reasons not involving the specified characteristics listed in the Act.  In re Cox, 3 Cal. 3d 205 (1970).  The question was whether a shopping center had the right to exclude a customer based only on his association with a young man who "wore long hair" and "dressed in an unconventional manner."

The court examined its previous decisions in Orloff v. Los Angeles Turf Club, 36 Cal. 2d 734 (1951) and Stoumen v. Reilly, 37 Cal. 2d 713 (1951), two cases brought under the

United States District Court

For the Northern District of California

1    Unruh Act's predecessor statute, the Civil Rights Act, which provided that "all citizens" were

2    entitled to "full and equal accommodations, advantages, facilities, and privileges," and also

3    prohibited "denying to any citizen, except for reasons applicable alike to every race or

4    color," access to places of public accommodation.  In Orloff, the court had held that the

5    Civil Rights Act barred the manager of a race track from ejecting a patron (a convicted

6    gambler) who had acquired a reputation as a man of immoral character.  Orloff, 36 Cal. 2d

7    at 739.  In Stoumen, the court had "recognized the right of homosexuals to obtain food and

8    drink in a bar and restaurant."  Stoumen, 37 Cal. 2d at 716.

9         The California Supreme Court concluded that Orloff and Stoumen had "clearly

10   established" that the Civil Rights Act prohibited all arbitrary discrimination in public

11   accommodations.  Cox, 3 Cal. 3d at 214.[1]  The court also noted that the Legislature had

12   enacted the 1959 amendment to §§ 51 and 52 subsequent to the decisions in Orloff and

13   Stoumen, neither of which had restricted discrimination to race, color, religion, ancestry, or

14   national origin.  Id. at 215.  Stating that "[w]e must, of course, presume that the Legislature

15   was well aware of these decisions," the court refused to "infer from the 1959 amendment

16   any legislative intent to deprive citizens in general of the rights declared by the statute and

17   stanchioned by public policy."  Id.

18        Based on the nature of the 1959 amendments, the past judicial interpretation of the

19   Civil Rights Act, and the history of legislative enactments that extended the statutes' scope,

20   the court concluded that "identification of particular bases of discrimination – color, race,

21   religion, ancestry, and national origin – added by the 1959 amendment, is illustrative rather

22   than restrictive."  Id. at 216.  The court noted that while the legislation had been invoked

23   primarily by persons alleging discrimination on the basis of race, "its language and its

24   history compel the conclusion that the Legislature intended to prohibit all arbitrary

25   discrimination by business establishments."  Id.

26

27        [1] The court added a qualification, however, stating that businesses subject to the Unruh
     Act retained the right "to establish reasonable regulations that are rationally related to the
28   services performed and facilities provided."  Id. at 212, 217 & n.13.

United States District Court
For the Northern District of California

1      In 1974, the Legislature amended §§ 51 and 52 to add "sex" to the list of "specified

2 personal characteristics.  The Legislature noted that section 51applied to all arbitrary

3 discrimination and that [t]he listing of possible bases of discrimination has no legal effect,

4 but is merely illustrative."

5      In 1982, in <u>Marina Point, Ltd. v. Wolfson</u>, 30 Cal. 3d 721 (1982), the California

6 Supreme Court applied <u>Cox</u> to hold that the owner of an apartment complex violated the

7 Unruh Act by refusing to rent to families with minor children.  The court again rejected the

8 view that the Act was limited to the categories specifically enumerated.  <u>Id.</u> at 732.  The

9 court cited the legislative history of the Act, which reflected that in 1974, in sending the bill

10 amending § 51 to the Governor for his signature, the Chairman of the Select Committee on

11 Housing and Urban Affairs had stated that "[t]he listing of possible bases of discrimination

12 [in the Act] has no legal effect but is merely illustrative."  <u>Id.</u> at 734.  The court also cited

13 various opinions of the California Attorney General, advising that non-enumerated

14 characteristics – such as occupation, marital status, or status as students or welfare

15 recipients – could provide a basis for an Unruh Act claim.  <u>Id.</u> at 736.

16      The following year, in <u>O'Connor v. Village Green Owners Ass'n</u>, 33 Cal. 3d 790

17 (1983), the court applied <u>Marina Green</u> to hold that a condominium development restricting

18 residency to persons over 18 violated the Unruh Act (noting also, however, that an age

19 limitation in a retirement community preserved for older citizens would likely not violate the

20 Act).  <u>Id.</u> at 793.

21      In 1985, the California Supreme Court applied <u>Cox</u> and <u>Marina Point</u> to hold that the

22 Boys' Club of Santa Cruz – a community recreation facility that was open (for a nominal

23 annual fee) to all Santa Cruz boys between the ages of 8 and 18 – discriminated against

24 girls in violation of the Unruh Act.  <u>Isbister v. Boys' Club of Santa Cruz</u>, 40 Cal. 3d 72

25 (1985).  The court's discussion focused primarily on the question whether the Boys' Club

26 qualified as a "business establishment," but the court did reiterate its by-now familiar

27 statement that "identification of particular bases of discrimination [in the Unruh Act] is

28 illustrative rather than restrictive."  <u>Id.</u> at 86-87 (quoting <u>Marina Point</u>, 3 Cal. 3d at 216).

United States District Court

For the Northern District of California

During this same period – 1982 to 1984 – three appellate courts held that the Unruh Act prohibits discrimination based on sexual orientation. First, in Hubert v. Williams, 133 Cal. App. 3d Supp. 1 (App. Dep't., Super. Ct, L.A. County, 1982), a quadriplegic tenant who required 24-hour care was evicted from his apartment because he had hired a lesbian attendant.  Relying on Marina Point, Cox, and Stoumen, the court held that discrimination on the basis of homosexuality violated the Unruh Act.  Id. at 3-5.

Second, in Curran v. Mt. Diablo Council of the Boy Scouts, 147 Cal. App. 3d 712 (1983), the Court of Appeal held that the expulsion of a person from membership in the Boy Scouts – the plaintiff was an Eagle Scout who had applied to be an adult leader – on the basis of his homosexuality was a violation of the Unruh Act.  Id. at 733-34.[2]

Third, in Rolon v. Kulwitzky, 153 Cal. App. 3d 289 (1984), two lesbians filed suit against a restaurant owner after they were refused service in a semi-private booth in the restaurant, and were instead offered service at a table in the main dining room.  The restaurant had a policy of allowing seating in the booths only by two people of the opposite sex.  The Court of Appeal observed that while the Unruh Act "preserves the traditional broad authority of owners and proprietors of business establishments to adopt reasonable rules regulating the conduct of patrons or tenants," it does not permit the exclusion of an individual who has committed no such conduct, "solely because he falls within a class of persons whom the owner believes is more likely to engage in misconduct than some other group."  Id. at 292.

In 1987, the Legislature added "blindness or other physical disability" to the list of "specified personal characteristics."

In 1991, the California Supreme Court issued its decision in Harris v. Capital Growth Investors XIV.  The plaintiffs were a group of prospective tenants who sued under the Unruh Act to challenge a landlord's requirement that any prospective tenant have a monthly

---

[2]  This ruling was subsequently reversed, on the ground that the Boy Scouts are not a "business establishment" governed by the provisions of the Unruh Act.  See Curran v. Mt. Diablo Council of Boy Scouts of America, 17 Cal. 4th 670, 700 (1998).

United States District Court

For the Northern District of California

income of at least three times the apartment's monthly rent.  The two issues in the case were whether the Act proscribes economic discrimination, and whether a plaintiff can state a claim under the Act for disparate impact (as opposed to disparate treatment).

The defendants asserted, based on the specific discriminatory classifications listed in the Act, that judicial expansion of those classifications to include whatever the courts might deem "arbitrary" could not be justified.  They also argued that the court should overrule Cox, Marina Point, and O'Connor.

The court found some indication that the Legislature had intended to confine the scope of the Act to certain specified types of discrimination, but also found an "[in]sufficiently compelling reason" to overrule Cox and its progeny.  Harris, 52 Cal. 3d at 1155.  The court noted that while the Legislature had amended the Act several times in the 20 years since the Cox decision, it had taken no steps to overrule the cases that had found that the Unruh Act prohibited discrimination on the basis of unconventional dress or appearance (Cox), families with children (Marina Point), persons under 18 (O'Connor), and homosexuality (Rolon , Curran, and Hubert).  Id.

The court reiterated that "[w]e generally presume the Legislature is aware of appellate court decisions," id. at 1155, and cited Marina Point for the proposition that when the Legislature amends a statute without altering portions of the provision that have been previously judicially construed, "the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction."  Id. at 1156 (citing Marina Point, 30 Cal. 3d at 734).  The court found the defendants' argument that the holdings of Cox, Marina Point, O'Connor, and other decisions extending the Unruh Act beyond its specified categories of discrimination had been somehow repudiated by the Legislature to be "untenable."  Id.

The court also concluded, however, that the Legislature's decision to enumerate personal characteristics in the Act, and to omit financial or economic ones, did suggest a limitation on the scope of the statute.  The court devised a three-part analysis to help answer the question whether, in view of the continued importance of the enumerated

United States District Court

For the Northern District of California

1    categories, and in light of the language and history of the Act and the probable impact on

2    its enforcement of the competing interpretations urged by the parties, the Act could

3    nonetheless be extended to claims of economic status discrimination.  Id. at 1159.

4         First, the court considered the language of the statute, noting an essential difference

5    between economic status (the basis for the plaintiffs' claims) and the Act's enumerated

6    categories and those added by judicial construction.  The common element shared by the

7    enumerated categories and those added by judicial construction was that they "involve

8    personal as opposed to economic characteristics."  Id. at 1160.  The court found no case in

9    which distinctions based on financial or economic status (as opposed to personal

10   characteristics) had been subjected to scrutiny under the Act; and found no support in the

11   language or history of the Act to support plaintiffs' contention that economic distinctions and

12   criteria were within the scope of the Act.  Id. at 1161-62.

13        Second, the court asked whether a legitimate business interest justified the minimum

14   income policy at issue in the case, and concluded that it did.  Id. at 1164.  The court

15   observed that "[b]usiness establishments have an obvious and important interest in

16   obtaining full and timely payment for the goods and services they provide," and noted that it

17   had previously "recognized that the Unruh Act did not prohibit businesses from making

18   economic distinctions among customers so long as the criteria used were not based on

19   personal characteristics and could conceivably be met by any customer."  Id. at 1162-63.

20   The court found that the minimum income policy was "not 'arbitrary' in the same way that

21   race and sex discrimination are arbitrary."  Id. at 1164.

22        Third, the court considered the potential consequences of allowing claims for

23   economic status discrimination to proceed under the Act, and suggested the possibility that

24   courts would become involved in a multitude of microeconomic decisions they are ill

25   prepared to make, and the possibility that landlords might abandon neutral criteria such as

26   income, and use subjective criteria that might promote the kind of discrimination the Unruh

27   Act prohibits.  Id. at 1165-69.

28        Although Harris did not overrule Cox, Marina Point, or O'Connor, several decisions

United States District Court

For the Northern District of California

1    issued by the court of appeal during the post-Harris period reflected a new unwillingness to

2    expand the number of protected characteristics under the Unruh Act.  For example, in

3    1991, the court in Gayer v. Polk Gulch, Inc., 231 Cal. App. 3d 515 (1991), found that the

4    Unruh Act did not encompass a retaliatory discrimination claim by a patron who had a

5    pending discrimination suit against a bar.  In 1994, the court in Roth v. Rhodes, 25 Cal.

6    App. 4th 530 (1994), found that a podiatrist could not maintain a claim under the Unruh Act

7    against the operator of a medical building who refused to lease space to him.  In 2001, the

8    court in Hessians Motorcycle Club v. J.C. Flanagans, 86 Cal. App. 4th 833 (2001), found

9    that the Unruh Act did not prohibit a sports bar from denying admittance to motorcycle club

10   members who refused to remove their "colors."

11        In 1992, a California appellate court held that the Unruh Act should not be expanded

12   to include "marital status" as an additional basis of prohibited discrimination.  See Beaty v.

13   Truck Ins. Exchange, 6 Cal. App. 4th 1455 (1992).  The plaintiffs, a same-sex couple, sued

14   the defendant insurance company because it refused to sell them a joint umbrella policy

15   under the terms and conditions offered to married couples.  The court acknowledged that

16   prior California decisions (Stoumen, Rolon, Curran, and Hubert) had held that

17   discrimination against individuals on the basis of sexual orientation violates the Unruh Act.

18   However, the court found that the case did not involve discrimination on the basis of sexual

19   orientation, because the insurance company treated all unmarried individuals the same with

20   regard to the issuance of umbrella policies, without regard to sexual orientation.  Id. at

21   1460-61.

22        The court then considered the claim of discrimination on the basis of marital status.

23   While recognizing that the Unruh Act had previously been extended to cover categories not

24   enumerated in the statute, the court noted that "no court has extended the Unruh Act to

25   claimed discrimination on the basis of marital status," and declared that "we shall not be the

26   first to do so."  Id. at 1462.  The court interpreted Harris as accepting that the Unruh Act

27   had previously been extended to unenumerated categories, but also as requiring that any

28   future expansion of prohibited categories should be "carefully weighed to insure a result

12

**United States District Court**
For the Northern District of California

1   consistent with legislative intent." Id.

2       The court applied the second two prongs of Harris' three-part analysis (legitimate

3   business interest and consequences of allowing the type of claim brought by plaintiffs).  In

4   place of the first prong (examination of the language of the statute, and determination

5   whether the proposed basis of discrimination – marital status – was similar to either the

6   enumerated characteristics or the judicially-construed characteristics), the court simply

7   concluded that marital status, like the economic status at issue in Harris, was a

8   characteristic the Act was not intended to reach.

9       The court found that the "strong policy in [California] in favor of marriage"

10  categorically precluded recognition of marital status discrimination under the Act.  In the

11  context presented, the court found that the policy in favor of marriage would not be

12  furthered and, in the case of an unmarried heterosexual couple, would actually be thwarted,

13  by including marital status among the prohibited categories.  Id. at 1462-63.  The court also

14  observed that the Legislature had included "marital status" in scores of statutes, but had

15  never taken the opportunity to include it in the Unruh Act.  Id.

16      Thus, as of 2002, when defendants denied the Butlers' request to post their profile

17  on ParentProfiles.com, the Unruh Act specifically prohibited discrimination on the basis of

18  race, color, religion, ancestry, national origin, sex, disability, and medical condition.[3]  The

19  California Supreme Court had repeatedly stated, however, that the enumerated categories

20  were "illustrative rather than restrictive," and the Legislature had never acted to repudiate

21  that construction, despite having amended the Act several times in the interim.  The Harris

22  court had slightly narrowed the earlier construction, holding that the Unruh Act did not apply

23  to prohibit discrimination based on "financial or economic status," or other characteristics

24  falling outside the realm of "personal characteristics."

25      Also as of 2002, a number of California appellate courts had ruled that the Unruh Act

26

27  _____

28      [3]  The Legislature again amended the Unruh Act in 1992, deleting "blindness or other"
    from the phrase "blindness or other disability," and adding "or medical condition" after
    "disability" in 2000.

United States District Court

For the Northern District of California

prohibited discrimination on the basis of sexual orientation.  While at least one appellate court had held that the Unruh Act did not prohibit discrimination on the basis of marital status, the California Supreme Court had indicated that it was an open question,[4] and had also repeatedly held that the Unruh Act's list of bases of discrimination was illustrative rather than restrictive.

In 2004, plaintiffs filed the complaint in this action, alleging discrimination based on marital status, sexual orientation, and sex, in violation of Civil Code §§ 51 and 51.5.

In 2005, the California Supreme Court issued its opinion in Koebke v. Bernardo Heights Country Club, 36 Cal. 4th 824 (2005).  In that case, a same-sex couple who were registered domestic partners sued a country club to which one of them belonged, alleging that the club's refusal to extend to them certain benefits it extended to married couples constituted marital status discrimination under the Unruh Act.

The court first summarized its prior decisions (Cox, Marina Point, O'Connor, Isbister, and Harris), and then applied the three-part Harris analysis to plaintiffs' marital status discrimination claim.  As an initial matter, the court found that marital status involves a personal characteristic, like those categories already covered by the Act, and disagreed with the defendant country club's argument that marital status is nothing more than a legal status imposed by the state.  Koebke, 36 Cal. 4th at 842.

The court then discussed the Beaty decision at length.  The court acknowledged the strong policy in California favoring marriage, and the practical interests served by that policy.  Id. at 844-45.  The court found, however, that "[t]hese policy considerations cannot justify denial of Unruh Civil Rights Act protection to domestic partners, whatever their

---

[4] In Smith v. Fair Employment & Housing Comm'n, 12 Cal. 4th 1143 (1996), the California Supreme Court held that the Fair Employment and Housing Act, Cal. Gov't Code § 12900, et seq., protects unmarried cohabitants from housing discrimination.  The plaintiffs had also raised an Unruh Act claim, asserting discrimination on the basis of marital status, but the court found it unnecessary to address that claim in light of the ruling on the FEHA claim.  The court noted the conflict on the issue, citing Beaty, where the court ruled that marital status discrimination was not actionable under the Unruh Act; and also citing Marina Point, where the California Supreme Court had stated to the contrary in dicta, see Marina Point, 30 Cal. 3d at 736, and Frantz v. Blackwell, 189 Cal. App. 3d 91, 95 (1987) (same).  Smith, 12 Cal. 4th at 1160 n.11.

United States District Court

For the Northern District of California

application to other unmarried individuals and couples." Id. at 845.  The court concluded

that the Domestic Partner Rights and Responsibilities Act of 2003 (effective January 1,

2005), by which the Legislature granted legal recognition comparable to marriage both

procedurally and in terms of substantive rights and obligations, was supported by policy

considerations similar to those that favor marriage.  Id.  Thus, the court found,

discrimination against registered domestic partners in favor of married couples is a type of

discrimination that falls within the ambit of the Unruh Act.  Id. at 846.

  The court then analyzed the second and third prongs of the Harris test, while

simultaneously distinguishing the Beaty court's findings.  In particular, the court found the

Beaty court's concerns inapplicable to registered domestic partners.  Id. at 846-48.  The

court also addressed the Beaty court's argument that the Legislature's failure to add marital

status to the list of characteristics protected under the Unruh Act was somehow significant,

declaring that the Legislature's failure to amend the Act to expressly prohibit discrimination

against domestic partners "is a particularly weak barometer of legislative intent."  The court

added, "No specific legislative declaration is required for this court to infer from the

statement of legislative intent accompanying the Domestic Partner Act an intent that

registered domestic partners should not be discriminated against in favor of married

couples in public accommodations."  Id. at 849.

  Finally, while it found that the defendant country club's spousal benefit policy did not

constitute impermissible marital status discrimination on its face prior to the effective date

of the Domestic Partner Act, the court indicated that it would consider whether plaintiffs

should be able to proceed on a claim that the policy, as applied, violated the Unruh Act

prior to January 1, 2005.  Id. at 851-52.

  With regard to sexual orientation, plaintiffs had argued that using marriage as a

criterion for allocating benefits necessarily denied such benefits to all the country club's

homosexual members, who, like plaintiffs, were unable to marry in California.  The court

compared this claim to the claim in Harris, where the plaintiffs had argued that the

defendant landlord's minimum income policy constituted gender discrimination because of

United States District Court

For the Northern District of California

1   its disparate impact on women, who were more likely to be receiving public assistance and

2   who generally had lower-paying jobs than men did. Id. at 853 (citing Harris, 52 Cal. 3d at

3   1170).  The court noted that it had previously rejected this theory, on the basis that the

4   Unruh Act prohibits intentional acts of discrimination, not disparate impact. Id. at 853-54.

5           The court recognized, however, that the plaintiffs had cast their claim as one of

6   disparate treatment rather than disparate impact, by alleging that discriminatory intent was

7   established by country club's adoption of marriage as the criterion by which to extend

8   benefits to some of its members, but not to others, for the reason that gays and lesbians

9   cannot marry in California.  Plaintiffs had also asserted that a policy or classification, in

10  itself permissible, may nonetheless be illegal if it is merely a device employed to

11  accomplish the prohibited discrimination.  Nevertheless, the court found no evidence

12  supporting plaintiffs' claim that the country club had adopted its spousal benefit policy to

13  accomplish discrimination on the basis of sexual orientation, and concluded that plaintiffs'

14  argument still seemed to be based on the effects of a facially neutral policy. Id. at 854.

15          The court did find evidence, however, that the country club had not applied its

16  facially neutral policy in an impartial manner – specifically, evidence that unmarried,

17  heterosexual members of the country club were granted membership privileges to which

18  they were not entitled, while plaintiffs were denied such privileges purportedly pursuant to

19  the country club's spousal benefit policy. Id.  There was also evidence that the directors of

20  the country club were motivated by animus toward plaintiffs because of their sexual

21  orientation. Id.  The court determined that the plaintiffs should be allowed to try to establish

22  that, prior to 2005, the spousal benefit policy was applied in a discriminatory fashion in

23  violation of the Unruh Act. Id. at 855.

24          Later that year (2005), the Legislature amended the Unruh Act to substitute "medical

25  condition, marital status, or sexual orientation" for "or medical condition." See 2005 Cal.

26  Legis. Serv. Ch. 420 (A.B. 1400).  This amendment was effective January 1, 2006.  In

27  addition, the Legislature appended the following findings:

28

(a)     Even prior to the passage of the Unruh Civil Rights Act, California law afforded broad protection against arbitrary discrimination by business establishments.  The Unruh Civil Rights Act was enacted to provide broader, more effective protection against arbitrary discrimination.  California's interest in preventing that discrimination is longstanding and compelling.

(b)     In keeping with that history and the legislative history of the Unruh Civil Rights Act, California courts have interpreted the categories enumerated in the act to be illustrative rather than restrictive.  It is the intent of the Legislature that these enumerated bases shall continue to be construed as illustrative rather than restrictive.

(c)     The Legislature affirms that the bases of discrimination prohibited by the Unruh Civil Rights Act include, but are not limited to, marital status and sexual orientation, as defined herein.  By specifically enumerating these bases in the Unruh Civil Rights Act, the Legislature intends to clarify the existing law, rather than to change the law, as well as the principle that the bases enumerated in the act are illustrative rather than restrictive.

(d)     It is the intent of the Legislature that the amendments made to the Unruh Civil Rights Act by this act do not affect the California Supreme Court's rulings in [Marina Point] and [O'Connor].

Cal. Civ. Code. § 51, Historical Notes – Historical and Statutory Notes.

Thus, as of January 1, 2005, based on the Koebke decision, the Unruh Act clearly prohibited marital status discrimination against registered domestic partners in California. As of January 1, 2006, based on the 2005 amendments to the Unruh Act and the Legislative findings, the Unruh Act clearly prohibits discrimination based on marital status (regardless of whether the affected persons are registered domestic partners) and also based on sexual orientation (though this had previously been established by judicial decisions dating back to the mid-1980s).  The Legislature has also confirmed that the enumerated characteristics should be construed as illustrative rather than restrictive.

C.     The Parties' Motions

1.     Choice of Law

Defendants argue that California law does not apply to plaintiffs' substantive claims, while plaintiffs contend that it does.

a.     Standard for Determining Applicable Law

Federal courts sitting in diversity look to the law of the forum state when making a choice-of-law determination. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496

1   (1941); Sparling v. Hoffman Const. Co., Inc., 864 F.2d 635, 641 (9th Cir. 1988); see also

2   Fields v. Legacy Health Sys., 413 F.3d 943, 950 (9th Cir. 2005).  Thus, because the

3   complaint in the present action was filed in California, California's choice-of-law rules apply.

4       In the absence of an effective choice of law by the parties, California applies the

5   "governmental interest" test.  Washington Mutual Bank FA v. Superior Court, 24 Cal. 4th

6   906, 919-20 (2001).  Under that analysis,

7

8       a court carefully examines the governmental interests or purposes served by
        the applicable statute or rule of law of each of the affected jurisdictions to
        determine whether there is a "true conflict."  If such a conflict is found to exist,
9       the court analyzes the jurisdictions' respective interests to determine which
        jurisdiction's interests would be more severely impaired if that jurisdiction's
10      law were not applied in the particular context presented by the case.

11  Kearney v. Salomon Smith Barney, Inc., 39 Cal. 4th 95, 100 (2006) (citing Reich v. Purcell,

12  67 Cal. 2d 551 (1967); Hurtado v. Superior Court, 11 Cal. 3d 574 (1974); Bernhard v.

13  Harrah's Club, 16 Cal. 3d 313 (1976); Offshore Rental Co. v. Continental Oil Co., 22 Cal.

14  3d 157 (1978)).

15      Kearney reflects the California Supreme Court's most recent thinking regarding the

16  application of the "governmental interest" test.  In that case, two California clients of

17  Salomon Smith Barney ("SSB") filed a class action alleging that telephone calls they had

18  made to brokers at SSB's Georgia office had been tape-recorded without the clients'

19  consent, in violation of California Penal Code § 637.2.  Penal Code § 637.2 authorizes a

20  civil cause of action for any violation of California's invasion-of-privacy statutory scheme,

21  and Penal Code § 632 is the specific portion of that scheme that governs the unlawful

22  recording of telephone conversations.  Plaintiffs also alleged a cause of action under

23  California Business & Professions Code § 17200.  Kearney, 39 Cal. 4th at 102.

24      SSB demurred to the complaint.  The trial court sustained the demurrer, concluding

25  that under both Georgia and federal law, recordings may be lawfully made in Georgia by

26  one party without the other party's knowledge or consent, and that SSB's conduct could

27  therefore not be viewed as unlawful or unfair or deceptive under § 17200.  The court found

28  further that any attempt to apply Penal Code § 632 to recordings made in Georgia would be

United States District Court

For the Northern District of California

1    preempted by federal law and would violate the Commerce Clause.  Id. at 102-03.

2           The court of appeal affirmed the trial court's judgment, but on the basis that under

3    the specific facts of the case, Georgia had a greater interest in having its law applied.  Id. at

4    103.  The California Supreme Court granted the petition for review to address what it

5    termed the "novel choice-of-law issue presented by this case."  Id.  The court initially

6    disposed of SSB's arguments regarding personal jurisdiction, legislative jurisdiction and

7    extraterritorial application of state law, federal preemption, and the Commerce Clause, id.

8    at 103-07, and then addressed the choice-of-law issue, which it termed "the only

9    substantial issue presented by the case."  Id. at 107.

10          The court summarized the governmental interest approach, as follows.

11          First, the court determines whether the relevant law of each of the potentially
             affected jurisdictions with regard to the particular issue in question is the
12          same or different.  Second, if there is a difference, the court examines each
             jurisdiction's interest in the application of its own law under the circumstances
13          of the particular case to determine whether a true conflict exists.  Third, if the
             court finds that there is a true conflict, it carefully evaluates and compares the
14          nature and strength of the interest of each jurisdiction in the application of its
             own law "to determine which state's interest would be more impaired if its
15          policy were subordinated to the policy of the other state" . . . and then
             ultimately applies "the law of the state whose interest would be the more
16          impaired if its law were not applied."

17   Id. at 107-08 (citation omitted).

18          The court then reviewed four of its previous decisions on the issue – Reich, Hurtado,

19   Bernhard, and Offshore Rental.  The first two cases – Reich and Hurtado – presented "no

20   true conflict" because in each case, only one of the states involved had an interest in

21   having its law applied.  The last two cases – Bernhard and Offshore Rental – each

22   presented a "true conflict," because in those cases, each state had an interest in having its

23   law applied, which required the court to conduct a "comparative impairment" analysis.

24          In Reich, a 1967 decision, the plaintiffs – Mr. Reich and one of his children – filed a

25   wrongful death action after Mrs. Reich and the Reichs' other child were killed in an

26   automobile accident while traveling through Missouri.  The Reichs were residents of Ohio at

27   the time of the accident.  After the accident, Mr. Reich and the surviving child moved to

28   California.

**United States District Court**

For the Northern District of California

1    The suit was filed in a California court.  The trial court held that Missouri law applied

2    because the accident had taken place in Missouri.  Missouri had a limit of $25,000 on

3    wrongful death damages, while Ohio and California had no such limits.  The question was

4    whether the law of Missouri, California, or Ohio should apply.

5    The California Supreme Court rejected the "law of the place of the wrong" rule, and

6    instead adopted the "governmental interest" test.  Reich, 67 Cal. 2d at 555-56.  The court

7    found that California had no interest in the case because plaintiffs were not California

8    residents at the time of the accident, and because California law did not limit damages.

9    The court found further that Missouri's interest was local, and did not apply to extend

10   protection to travelers from another state.  Ohio had a substantial interest in having its law

11   applied, while Missouri did not.  Thus, the court found, the case did not present a true

12   conflict and Ohio law applied.

13   The facts in Hurtado, a 1974 decision, were somewhat similar to the facts in Reich.

14   The plaintiffs (widow and children of Antonio Hurtado) filed a wrongful death action in

15   California.  Antonio Hurtado had been riding in an automobile owned and operated by his

16   cousin, defendant Manuel Hurtado, and was killed when Manuel Hurtado's automobile

17   collided with a pick-up truck owned and operated by defendant Jack Rexius.  The plaintiffs

18   (Widow Hurtado and children) and the decedent (Antonio Hurtado) were residents of

19   Mexico, and defendants Manuel Hurtado and Jack Rexius were California residents.  All

20   vehicles were registered in California.

21   At the time of the accident, Mexico had a law that limited damages in wrongful death

22   actions, while California had no limit.  The question was whether the court should apply the

23   law of California or the law of Mexico.

24   The California Supreme Court noted the importance of correctly identifying the

25   various interests in a particular type of action.  The court concluded that where a state's

26   laws limit damages in a wrongful death action, the interest of the state is to protect

27   defendants from excessive financial burdens or exaggerated claims.  This interest is local,

28   because it is designed to protect residents of the state.  However, the court found that

United States District Court
For the Northern District of California

1  Mexico had no interest in applying its limitation of damages because it had no defendant

2  residents to protect with such limitation – it was the plaintiffs who were the residents of

3  Mexico, not the defendants.  Hurtado, 11 Cal. 3d at 583-84.

4        In Bernhard, a 1976 decision, the California Supreme Court was confronted with a

5  "true conflict" case for the first time since adopting the "governmental interest" analysis.

6  Bernhard was a dramshop-liability case.  The plaintiff, a resident of California, was injured

7  in California by a drunk driver.  The defendant, Harrah's Club, was the owner of a Nevada

8  tavern that had served alcohol to the driver who injured the plaintiff.

9        Plaintiff filed suit in California, under a law that allowed a person injured by an

10  intoxicated driver to file a civil action to recover damages from a negligent tavern owner.[5]

11  In Nevada, by contrast, while it was a crime to sell alcohol to an intoxicated person, the

12  state courts had ruled that a tavern owner could not be held civilly liable in tort for injuries

13  caused by that intoxicated person.

14        The court found that this presented a true conflict because each state had an

15  interest in the application of its respective law of liability, and the interests of the two states

16  conflicted.  Nevada had an interest in having its decisional rule applied to protect its tavern

17  owners from being subjected to a form of civil liability that Nevada declined to impose.

18  California, on the other hand, had an interest in applying its rule imposing liability in such

19  circumstances, because the rule was intended to protect members of the public from

20  injuries to persons and property resulting from excessive use of intoxicating liquor.

21  California also had a special interest in extending this protection to California residents

22  injured in California.  Bernhard, 16 Cal. 3d at 322-24.  The question was whether California

23  or Nevada law applied.

24        The court applied the third part of the governmental interest test – the "comparative

25  impairment" analysis – to determine which state's interest would be more impaired if its

26  policy were subordinated to the policy of the other state.  Id. at 320.  The court first noted

27  _____

28        [5]  This law was subsequently abrogated by the California Legislature.  See Cory v.
Shierloh, 29 Cal. 3d 430, 435 (1981).

United States District Court

For the Northern District of California

that Harrah's "by the course of its chosen commercial practice" had "put itself at the heart of California's regulatory interest, namely to prevent tavern keepers from selling alcoholic beverages to obviously intoxicated persons who are likely to act in California in the intoxicated state." Id. at 322.

The court observed that California "cannot reasonably effectuate its policy if it does not extend its regulation to include out-of-state tavern-keepers such as defendant who regularly and purposefully sell intoxicating beverages to California residents," under circumstances in which it is likely that intoxicated persons will return to California while still in an intoxicated state. Id. at 322-23. The court found that California's interest would be significantly impaired if its policy were not applied to defendant Harrah's. Id. at 323.

In Offshore Rental, a 1978 decision, a California corporation filed suit in California against an out-of-state corporation (which did business in California, Louisiana, and other states), alleging damage to business interests. The California corporation sought to recover damages for loss of services of one of its key corporate officers, who was injured at the defendant corporation's Louisiana premises. The question was whether California or Louisiana law applied.

Although Louisiana law allowed a "master" to bring an action "against any man for beating or maiming his servant," Louisiana courts had ruled that a corporate plaintiff could not state a cause of action under that law for loss of services of its officer. California cases, on the other hand, seemed to support a cause of action under California Civil Code § 49, which provided that "[t]he rights of personal relations forbid . . . any injury to a servant which affects his ability to serve his master." California courts had indicated that a corporation could assert a claim under Civil Code § 49 against a third party for negligent injury to a key employee.

The California Supreme Court found that the laws of Louisiana and California were directly in conflict, and looked at the governmental policies underlying the laws of the two states, in order to determine whether either state had an interest in applying its policy to the case.

United States District Court
For the Northern District of California

1    Louisiana's refusal to permit recovery for loss of a key employee's services was

2    predicated on a policy of "protect[ing] negligent resident tort-feasors acting within

3    Louisiana's borders from the financial hardships caused by the assessment of excessive

4    legal liability or exaggerated claims resulting from the loss of services of a key employee."

5    Offshore Rental, 22 Cal. 3d at 163-64.  "Clearly," the court observed, "the present

6    defendant is a member of the class which Louisiana law seeks to protect, since defendant

7    is a Louisiana 'resident' whose negligence on its own premises has caused the injury in

8    question," and "negation of plaintiff's cause of action serves Louisiana's policy of avoidance

9    of extended financial hardship to the negligent defendant."  Id. at 164.

10    The court recognized as "equally clear," however, that "application of California law

11    to the present case will further California's interest," noting that California, through Civil

12    Code § 49, "expresses an interest in protecting California employers from economic harm

13    because of negligent injury to a key employee."  Id.  Moreover, "California's policy of

14    protection extends beyond such an injury inflicted within California, since California's

15    economy and tax revenues are affected regardless of the situs of physical injury."  Id.

16    Having found a true conflict between the law of Louisiana and the law of California,

17    the court proceeded with the analysis to determine which state's interest would be more

18    impaired if its policy were subordinated to the policy of the other state.  This analysis,

19    according to the court, does not involve "weighing" the conflicting governmental interests, in

20    the sense of determining which interest is "worthier" or expresses the "better" social policy,

21    but rather can be viewed as an attempt to determine "the relative commitment of the

22    respective states to the laws involved."  Id. at 165-66 (citations omitted).  "The approach

23    incorporates several factors . . . [including] the history and current status of the states' laws;

24    [and] the function and purpose of those laws."  Id. at 166.

25    The court characterized the Louisiana law as being in the "main stream" of American

26    jurisdictions, as the majority of states that had considered the question did not sanction

27    actions for harm to business employees.  Id. at 167-68.  By contrast, California had

28    exhibited little interest in applying Civil Code § 49, no California court had squarely held

**United States District Court**

For the Northern District of California

that California law provides a cause of action for harm to business employees, and no California court had recently considered the issue at all. Id. at 168. Thus, to the extent that § 49 provided a cause of action for injuries to key corporate employees, it nonetheless constituted a law that was "archaic and isolated in the context of the laws of the federal union," and California's interest in the application of its unusual and outmoded statute was comparatively less strong than Louisiana's corollary interest in its "prevalent and progressive law." Id.

The court found further that while the "law of the place of the wrong" is not necessarily the applicable law for all tort actions, "the situs of the injury remains a relevant consideration." Id. The court found that Louisiana had a "vital interest in promoting freedom of investment and enterprise within Louisiana's borders, among investors incorporated both in Louisiana and elsewhere," and that the imposition of liability on the defendant would "strike at the essence of a compelling Louisiana law." Id. The court also noted that the plaintiff corporation was particularly able to calculate risks and plan accordingly, by purchasing "key employee" insurance – and indeed, should have anticipated a need for such protection – whereas defendant reasonably did not anticipate a need for insurance to protect against "key employee" losses at its Louisiana facility, as that type of loss is not actionable under Louisiana law. Id. at 168-69.

Following its review of the Reich, Hurtado, Bernhard, and Offshore Rental decisions, the Kearney court turned to an examination of the facts of the case before it, in order to determine whether California law or Georgia law apply to the recording of a telephone conversation that occurs between a person in California and a person in Georgia.

The court first analyzed the California statutory scheme, noting that Penal Code § 632 – the law prohibiting the recording of telephone conversations without the knowledge of both participants – was part of California's broad, protective invasion-of-privacy statute. Kearney, 39 Cal. 4th at 115-16. Further, the legislatively prescribed purpose of the 1967 invasion-of-privacy statute "is to 'protect the privacy of the people of this state.'" Id. at 119 (citing Penal Code § 630).

United States District Court

For the Northern District of California

The court found that the stated purpose "certainly supports application of the statute in a setting in which a person outside California records, without the Californian's knowledge or consent, a telephone conversation of a California resident who is within California." Id. "The privacy interest protected by the statute is no less directly and immediately invaded when a communication within California is secretly and contemporaneously recorded from outside the state than when this action occurs within the state." Id.

The court then turned to the Georgia law.  The basic provision of the Georgia statute is the prohibition of the employment of devices that would permit the clandestine "overhearing, recording or transmitting of conversations or observing of activities which occur in a private place." Id. at 121 (citing Ga. Code Ann. § 16-11-62).  The policy underlying the statute is the public policy of the state to "'protect the citizens of this State from invasions upon their privacy.'" Id.  At the same time, however, another provision of that statutory scheme provides that nothing in § 16-11-62 "shall prohibit a person from intercepting a wire, oral, or electronic communication where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." Id. (citing Ga. Code Ann. § 26-11-66).

Georgia courts have long interpreted the Georgia privacy statutes as not applicable when a conversation is recorded by one of the participants in the conversation.  Id. at 121-22.  Thus, the court noted, Georgia law differs from California law in this respect, although nothing in either law addresses whether the law is intended to apply to a telephone call in which one of the parties is in another state.  Id. at 122.

The Kearney court concluded that the case presented a true conflict – California had a legitimate interest in having its law applied because the plaintiffs were California residents whose telephone conversations in California were recorded without their knowledge or consent; and Georgia had a legitimate interest in not having liability imposed on persons or businesses who acted in Georgia in reliance on the provisions of Georgia law, because the conduct at issue in the case involved activity engaged in by defendant's employees in

Georgia. Id. at 123.

The court then considered which state's interest would be more impaired if its policy were subordinated to the policy of the other state. Id. at 124. The court first looked at the degree of impairment of California's interest that would result if Georgia law rather than California law were applied. The court noted that unlike the situation in Offshore Rental, the California statute in question was not "ancient" or "little used." Rather, California courts have repeatedly invoked and vigorously enforced the provisions of Penal Code § 632. Id.

Moreover, the court noted, in recent years the California Legislature has continued to add provisions and make modifications to the invasion-of-privacy statutory scheme at issue, which, along with California's constitutional privacy provision (Cal. Const., art. I, § 1) was enacted specifically to protect Californians from overly intrusive business practices. Id. at 125. The court concluded that California had a strong and continuing interest in the full and vigorous application of all the provisions of Penal Code § 632 prohibiting the recording of telephone conversations, and that the failure to apply the statute would substantially undermine the protection it afforded. Id.

The court concluded that the application of California law would have a relatively less severe effect on Georgia's interests, than would the application of Georgia law on California's interests. Id. at 126. First, because California law was more protective of privacy interests than the comparable Georgia statute, the application of California law would not violate any privacy interest protected by Georgia law. Id. at 126-27.

Second, with regard to businesses in Georgia that record telephone calls, California law would apply only to those calls made to or received from California, not to all calls to and from such Georgia businesses, and it would be easy to identify both the calls being made to California residents, and the calls coming in from California residents. Id. at 127.

Third, applying California law to a Georgia business' recording of telephone calls between its employees and California customers would not severely impair Georgia's interests. The calls could still be made and could still be recorded – the only requirement would be that the recording not be secret or undisclosed. Id. Further, to the extent that the

**United States District Court**
For the Northern District of California

Georgia law is intended to protect a business' ability to <u>secretly</u> record calls to and from its customers, the application of California law to those calls made to and from California customers "would represent only a relatively minor impairment of Georgia's interests."  <u>Id.</u>

The court concluded that because the interests of California would be severely impaired if Georgia law were applied, and because the interests of Georgia would not be significantly impaired if California law were applied, California law should apply in determining whether the alleged secret recording of telephone conversations at issue in the case constitutes an unlawful invasion of privacy.  <u>Id.</u> at 127-28.

> b.    *Whether California Law Applies in the Present Action*

In issuing its decision in <u>Kearney</u>, the California Supreme Court did not change the law regarding choice-of-law analysis.  The "governmental interest" test, as previously articulated and applied in <u>Reich</u>, <u>Hurtado</u>, <u>Bernhard</u>, and <u>Offshore Rental</u>, still provides the basis for determining which state's law applies in a case involving multi-state interests.

This court now considers whether, in light of this analysis, plaintiffs can assert claims under California law in the present case.

> i.    *whether the laws of Arizona differ from the laws of California*

The parties agree – though for different reasons – that Arizona law differs from California law.  Defendants assert that the issue for choice-of-law analysis is not merely whether Arizona and California treat sexual orientation and marital status discrimination differently, but whether the acts about which plaintiffs complain could support a claim under Arizona law.  They argue that Arizona does not permit same-sex couples to adopt jointly, and that same-sex couples have no claim for discrimination based on being treated differently than married couples when it comes to adoption or marriage.  They also contend that because a same-sex couple cannot jointly adopt in Arizona, there can be no claim for discrimination in Arizona based on the refusal to "publish" a profile for a same-sex couple.

Plaintiffs, on the other hand, focus on the fact that while California law prohibits discrimination on the basis of sexual orientation and marital status, Arizona law does not affirmatively permit Arizona businesses to discriminate against gays or lesbians or

United States District Court

For the Northern District of California

1   domestic partners, Arizona's public accommodation statute is silent with regard to

2   discrimination on the basis of sexual orientation and marital status, and Arizona courts

3   have not ruled on the question whether the state's public accommodation statute forbids

4   discrimination against same-sex couples.  Plaintiffs contend that while Arizona has no state

5   law prohibiting sexual orientation discrimination by business establishments, it does not

6   condone such discrimination.  They also note that various localities in Arizona have

7   promulgated local policies prohibiting discrimination based on sexual orientation or marital

8   status in public accommodation and other areas.

9          Both Arizona and California have enacted anti-discrimination laws, and laws

10   governing adoption and marriage.  California's Unruh Act is discussed at length above.

11   The Arizona Civil Rights Act of 1965 prohibits discrimination in places of public

12   accommodation, "against any person because of race, color, religion, sex, national origin or

13   ancestry."  Ariz. Rev. Stat. § 41-1442.  It is unlawful under this statute to deny or withhold

14   "accommodations, advantages, facilities, or privileges thereof" based on the enumerated

15   characteristics, or to make any distinction "with respect to any person" based on the

16   enumerated characteristics, "in connection with the price or quality of any item, goods or

17   services offered by or at any place of public accommodation."  Id.

18          "Places of public accommodation" under § 41-1442 include

19

20          all public places of entertainment, amusement or recreation, all public places
            where food or beverages are sold for consumption on the premises, all public

21          places which are conducted for the lodging of transients or for the benefit, use
            or accommodation of those seeking health or recreation, and all

22          establishments which cater or offer their services, facilities or goods to solicit
            patronage from members of the general public.

23   Ariz. Rev. Stat. § 41-1441.

24          On its face, the Arizona statute is similar to the pre-1987 version of the Unruh Act –

25   prior to addition of disability, medical condition, marital status, and sexual orientation to the

26   list of protected characteristics – except that it uses the term "public accommodations"

27   rather than "business establishments."  As interpreted by the Arizona courts, however,

28   there is a significant difference.  No Arizona court has ever held, as has the California

United States District Court

For the Northern District of California

1  Supreme Court with regard to the Unruh Act, that the categories specified in ARS § 41-

2  1442 are "illustrative" only.  Moreover, the Arizona statute was enacted in 1965; prior to that

3  time, Arizona had no state laws prohibiting discrimination in public accommodations.

4        The adoption and marriage laws of the two states are similar in some respects, but

5  different in others.  Under Arizona law, "[a]ny adult resident of this state, whether married,

6  unmarried or legally separated is eligible to qualify to adopt children.  A husband and wife

7  may jointly adopt children."  Ariz. Rev. Stat. § 8-103.  This statute was adopted in 1970,

8  and has not been amended since.

9        Because the statute allows adoption by "[a]ny" adult resident, it does not regulate

10  adoption on the basis of the sexual orientation of a single adoptive parent.  Moreover, in

11  April 2006, HB 2696, a bill that would have given married couples preference over single

12  people in adopting children, was defeated in the Arizona Legislature.  See

13  http://www.azleg.gov/FormatDocument.asp?inDoc=/legtext/47leg/2r/bills/hb1696o.asp.

14        Arizona law does not say anything about joint adoptions, other than that a "husband

15  and wife" may jointly adopt.  Arizona does have a law, added in 1996, providing that

16  "[m]arriage between persons of the same sex is void and prohibited."  Ariz. Rev. Stat. § 25-

17  101(C).[6]  With the same bill, the Legislature amended the law relating to marriages

18  contracted in other states, to provide that "[m]arriages valid by the laws of the place where

19  contracted are valid in this state, except marriages that are void and prohibited by § 25-

20  101."  Ariz. Rev. Stat. § 25-112.[7]

21        Thus, since same-sex couples cannot marry in Arizona, and if married in another

22  state, will not be considered married in Arizona, they presumably would not qualify under

23  the "joint" adoption provision of § 8-103.  However, Arizona law does not specifically

24

25        [6]  The Court of Appeals of Arizona held in 2003 that Arizona's prohibition of same-sex
26  marriages is constitutional.  Standhardt v. Superior Court, 206 Ariz. 276, 77 P.3d 451 (Ariz.
   App. 2003).

27        [7]  Prior to 1996, the relevant statute had provided that "[m]arriages valid by the laws of
28  the place where contracted are valid in this state."  Ariz. Code of 1939 § 63-108 (currently
   codified as Ariz. Rev. Stat. § 25-112(A)).

United States District Court

For the Northern District of California

1  prohibit joint adoptions by same-sex couples.

2      Arizona allows stepparent adoption.  In Arizona, "stepparent adoption" refers to

3  "adoption by the spouse of the child's parent."  Ariz. Rev. Stat. § 8-117(C); see also Ariz.

4  Rev. Stat. § 25-409(F) (visitation granted to grandparents or great-grandparents

5  automatically terminates if child is placed for adoption, except where the child is adopted

6  "by the spouse of a natural parent if the natural parent remarries").  Based on this language

7  – specifically, the reference to the "spouse" of the child's parent – it is likely that a person of

8  the same sex as the child's parent would not be eligible to adopt as a stepparent under

9  Arizona law, because that person cannot be a "spouse" (husband or wife).

10     Arizona law is silent with regard to second-parent adoption.  "Second-parent"

11  adoption has been defined in California as "an independent adoption whereby a child born

12  to [or legally adopted by] one partner is adopted by his or her non-biological or non-legal

13  second parent, with the consent of the legal parent, and without changing the latter's rights

14  and responsibilities."  Sharon S. v. Superior Court, 31 Cal. 4th 417, 422 n.2 (2003) (citation

15  omitted).

16     California permits "any adult" to adopt a minor child.  Cal. Fam. Code § 8600.  The

17  adult must be at least 10 years older than the child, unless the adult is a stepparent or

18  sister, brother, aunt, uncle or first cousin.  Cal. Fam. Code § 8601.  A married person may

19  not adopt a child without consent of his or her spouse.  Cal. Fam. Code § 8603.  Thus,

20  Arizona and California both permit single adoption without any limitation as to sexual

21  orientation, and joint adoption by married couples.

22     California allows stepparent adoption, defined as the "adoption of a child by a

23  stepparent where one birth parent retains custody and control of the child."  Cal. Fam.

24  Code § 8543; see also Cal. Fam. Code §§ 9000-9007.  However, unlike Arizona, California

25  does not classify stepparent adoption as adoption by the "spouse" of the child's parent.

26     Second-parent adoption is also legal in California.  While there has never been a

27  statute expressly authorizing second-parent adoption, California adoption statutes have

28  always permitted adoption without regard to the marital status of prospective adoptive

30

United States District Court
For the Northern District of California

1    parents.  Sharon S., 31 Cal. 4th at 433.  At least as early as 1999, the California

2    Department of Social Services – the agency that oversees county child welfare agencies

3    that perform home studies in adoption cases – had a stated policy that unmarried couples

4    seeking to adopt were to be evaluated on the same basis as married couples.  Id. at 433

5    n.8.  The California Supreme Court in Sharon S. noted that as of 2003, published materials

6    indicated that between 10,000 and 20,000 second-parent adoptions had been granted in

7    California over the years.  However, it was not until August 4, 2003, that the California

8    Supreme Court (in Sharon S.) officially recognized the validity of second-parent adoptions.

9         On March 8, 2000, the voters passed Proposition 22, an initiative providing that

10   "[o]nly marriage between a man and a woman is valid or recognized in California."  This law

11   is codified as California Family Code § 308.5.  Pursuant to this statute, California will not

12   recognize same-sex marriages even if those marriages are validly formed in other

13   jurisdictions that permit same-sex marriage.[8]  Thus, like Arizona, California does not allow

14   same-sex couples to marry.

15        However, unlike Arizona, the California Legislature has enacted legislation allowing

16   civil unions (domestic partnerships).  California created a "domestic partner registry" in

17   1999.  See Cal. Fam. Code § 297 (effective January 1, 2000).  The statute was

18   subsequently amended to expand the rights and obligations of domestic partners.  In 2001,

19   the California Legislature enacted AB 25, which became effective on January 1, 2002.

20   Among other things, AB 25 provided that registered domestic partners were entitled to use

21   the streamlined step-parent adoption procedures.  See Cal. Fam. Code § 9000(g).  Thus,

22   AB 25 equalized registered domestic partners with married spouses with regard to the

23   issue of adoption in California.

24        As of January 1, 2005, California's domestic partner law provides most of the same

25   rights and responsibilities of spouses under California law, such as complete inheritance

26

27        ───────────────────

28        [8] Section 308.5 is being challenged in the California courts.  See In re Marriage Cases,
     49 Cal. Rptr. 3d 675, review granted and opinion superseded by In re Marriage Cases, 149
     P.3d 737, 53 Cal. Rptr. 3d 317 (Cal. 2006).

United States District Court
For the Northern District of California

1   rights, community property, joint responsibility for debt, and the right to request support

2   from the other partner upon dissolution of the partnership.  Cal. Fam. Code § 297.5.[9]

3       While Arizona law does not authorize civil unions, the voters of the state recently

4   rejected an attempt to make the enactment of such laws impossible in the future, by

5   rejecting Proposition 107 in the Arizona November 2006 state-wide election.  Proposition

6   107 would have amended the Arizona Constitution to state that marriage consists of a

7   union of one man and one woman, and to prohibit the state and its political subdivisions

8   from creating or recognizing any legal status for unmarried persons that is similar to that of

9   marriage.  See http://www.azsos.gov/election/2006/General/ballotmeasures.htm.

10      Thus, as of 2002, when the Butlers sought to have their profile posted on

11  ParentProfiles.com, Arizona state law did not prohibit discrimination on the basis of sexual

12  orientation or marital status; any single person could petition to adopt in Arizona; there was

13  no prohibition against single homosexual persons becoming adoptive parents; there was no

14  law prohibiting joint adoptions by same-sex couples, although the law explicitly provided for

15  joint adoptions only by "husband and wife;" and there was no law explicitly prohibiting

16  same-sex second-parent adoptions.  The law regarding adoptions is the same today – plus,

17  the Arizona Legislature recently defeated a bill that would have given preference to married

18  couples over single people in adoption.

19      As of 2002, California prohibited discrimination in public accommodations on the

20  basis of sexual orientation; it was an open question whether discrimination on the basis of

21  marital status was also prohibited; any single person could adopt in California; there was no

22  law prohibiting adoptions by same-sex couples; and California allowed stepparent and

23  second-parent adoptions without reference to sexual orientation or marital status, and had

24  equalized registered domestic partners with married spouses with regard to the issue of

25  _____

26      [9] Section 297.5 was unsuccessfully challenged in the California courts.  The plaintiffs
    argued that § 297.5 impermissibly amended Family Code § 308.5 (marriage is between a man
27  and a woman) without voter approval in violation of the California Constitution.  The Court of
    Appeal found that the language of Proposition 22 said nothing about precluding the Legislature
28  from granting rights to domestic partners that were the equivalent of rights granted to married
    couples.  See Knight v. Superior Court, 128 Cal. App. 4th 14 (2005).

United States District Court

For the Northern District of California

1   adoption.

2        Having determined that the laws of the two states differ in some respects, as

3   explained above, the court now considers whether a true conflict exists.

4                    ii.      *whether a true conflict exists*

5        Both plaintiffs and defendants argue that no true conflict exists in this case.

6   Defendants contend that there is no true conflict because Arizona has an interest in

7   applying its own laws under the facts of this case, while California does not.  Defendants

8   assert that Arizona has an interest in determining which business practices that occur in

9   Arizona will subject Arizona businesses to liability; in ensuring that businesses operating

10  within its borders are not subjected to liability for activities or practices that are legal in

11  Arizona; and in assuring that its citizens are not penalized when they enter into or refuse to

12  enter into contracts in Arizona with persons from the minority of states with substantially

13  different laws, such as those that prohibit marital status discrimination or sexual orientation

14  discrimination.

15       Defendants contend that California has a limited interest – if any – in applying its

16  law.  They claim that the "policy" interests upon which plaintiffs rely are still developing

17  within California – noting that the California Legislature only recently included sexual

18  orientation discrimination or marital status discrimination in the list of prohibited conduct

19  under the Unruh Act; claiming that it was not clear until recently that two "unrelated"

20  persons (presumably meaning "unmarried") had the right to adopt a child under California

21  law; and asserting that no court has found that marital status discrimination was prohibited

22  under the Unruh Act prior to January 1, 2005.  Thus, they contend, California cannot be

23  deemed to have had a strong commitment in 2002 to the policies underlying plaintiffs'

24  claims.

25       Defendants also argue that the Unruh Act's stated purpose – "to guarantee access

26  to public accommodations on the part of all persons [in California] regardless of race, sex,

27  religion, or other characteristics that have no bearing on a person's status as a responsible

28  consumer," Harris, 52 Cal. 3d at 1168 – makes it clear that California's interest relates to

United States District Court

For the Northern District of California

accommodations in California.  Defendants argue that because Adoption.com's business operations, office facilities, and "Internet servers"[10] are located in Arizona, and because ParentProfiles.com may be accessed in California only after a person in California sends a request for information to the Internet server located in Arizona, a resident of California must, in effect, go to Arizona in order to obtain services from defendants.  Thus, according to defendants, the public accommodation at issue is in Arizona rather than in California.  They contend that California has no interest in mandating a public accommodation in another state.

Plaintiffs also claim that there is no true conflict in this case.  However, they argue that the absence of a true conflict means that California is entitled to apply its own law.  They submit that there is no true conflict between the laws of the two states because only California law is affected, asserting that a true conflict exists only where, as stated by the court in Offshore Rental, "each of the states involved has a legitimate but conflicting interest in applying its own law will we be confronted with a true conflicts case."  Offshore Rental, 22 Cal. 3d at 163 (emphasis added).

Plaintiffs contend that this case directly implicates the primary purpose of the Unruh Act – to guarantee access to public accommodations for all Californians – and that California courts have invoked and vigorously enforced the Unruh Act from its inception to the present.  They also note that the 2005 amendments to the Unruh Act added language expressly codifying the prohibition against discrimination on the basis of sexual orientation and marital status.  Thus, they argue, as in Kearney, "California must be viewed as having a strong and continuing interest in the full and vigorous application" of its law in this case.

---

[10]   Defendants refer to "Internet server" and "Web server" interchangeably, without defining those terms.  Although the court could not locate a definition for "Internet server," a "Web server" can be either 1) a computer that is responsible for accepting HTTP requests from clients, which are known as Web browsers, and serving them HTTP responses along with optional data contents, which are usually Web pages such as HTML documents and linked objects (images, etc.); or 2) a computer program that provides the functionality described in the first sense of the term.  See http://en.wikipedia.org/wiki/Web_server (last visited March 30, 2007).  Since plaintiffs appear to be talking about the physical location of the server, they must be referring to a computer.

United States District Court

For the Northern District of California

1   See Kearney, 39 Cal. 4th at 124-25.  Plaintiffs assert that Arizona has no legitimate interest

2   in a policy of discrimination on the basis of sexual orientation or marital status.

3       The California Supreme Court found a "true conflict" in Bernhard, in Offshore Rental,

4   and in Kearney because in each of those cases, the laws of two states were in conflict, and

5   that conflict reflected competing state interests.  In Bernhard, Nevada law held that tavern

6   owners were not liable for injuries caused by drunk drivers who had obtained alcohol from

7   the tavern owners, while California law imposed liability on the tavern owners for such

8   injuries.  In Offshore Rental, Louisiana law held that a corporate plaintiff could not bring a

9   claim for the loss of services of one of its officers, while California law arguably allowed

10  such a claim.  In Kearney, it was legal under Georgia law to record a telephone

11  conversation if only one of the participants knew it was being recorded, but illegal under

12  California law to record such a conversation unless both participants were aware of the

13  recording.

14      In the present case, neither the Arizona Civil Rights Law nor the Unruh Act

15  specifically prohibited discrimination on the basis of sexual orientation or marital status in

16  2002.  However, while there are no reported Arizona cases holding (even up to the present)

17  that either of those characteristics can provide a basis for a claim of discrimination in public

18  accommodations under the Arizona Civil Rights Law, a number of California cases had held

19  by 1984, at least with regard to discrimination on the basis of sexual orientation, that such

20  discrimination was prohibited by the Unruh Act.  As of January 2006, of course, the Unruh

21  Act unambiguously prohibits discrimination on the basis of both sexual orientation and

22  marital status.

23      Also as of October 2002, both Arizona and California allowed any single person to

24  adopt.  Neither Arizona nor California had a law prohibiting adoptions by same-sex couples

25  – although Arizona law explicitly provided for joint adoptions only by "husband and wife,"

26  and defined "stepparent" adoption as adoption by the "spouse" of the child's parent; while

27  California allowed both stepparent and second-parent adoptions, regardless of the gender

28  of the adoptive parents.

United States District Court

For the Northern District of California

1    While the differences between the laws of Arizona and California are not as distinct

2  as the differences at issue in Bernhard, Offshore Rental, and Kearney, this case arguably

3  presents a true conflict, if only for the reason that it is unlikely that plaintiffs could have

4  brought a similar discrimination claim under Arizona law.  California has a strong interest in

5  enforcing its anti-discrimination laws.  It is less clear what interest Arizona might have in

6  allowing discrimination in public accommodations on the basis of sexual orientation or

7  marital status, or in applying its own law to California residents.  The only interest plaintiffs

8  have articulated is Arizona's interest in protecting its resident businesses from uncertainty.

9    Plaintiffs have supported their position with citations to the Unruh Act and the cases

10 that have interpreted it, while defendants have provided no support for their claim that

11 Arizona has a strong interest in protecting its businesses from "surprise" penalties in the

12 form of liability under the anti-discrimination laws of other states.  It is true that the courts in

13 Kearney, Offshore Rental, and Bernhard considered a similar interest under the facts of

14 those cases with regard to Georgia, Louisiana, and Nevada, respectively.  See Kearney, 39

15 Cal. 4th at 128-29; Offshore Rental, 22 Cal. 3d at 168; and Bernhard, 16 Cal. 3d at 318.

16 But defendants have not pointed to any Arizona statute or judicial decision establishing that

17 Arizona has a paramount interest in ensuring certainty in business dealings for Arizona

18 businesses.  Moreover, as the court in Kearney pointed out, "a company that conducts

19 business in numerous states ordinarily is required to make itself aware of and comply with

20 the law of a state in which it chooses to do business."  Kearney, 39 Cal. 4th at 105; see

21 also Bernhard, 16 Cal. 3d at 322-23.  Nevertheless, in view of this finding that the interests

22 of the two states are not entirely in accord, the court will consider the "comparative

23 impairment" of each state's interest.

24    *iii.    which state's interest would be more impaired if its law were not*

25    *applied*

26    Once it has determined that a true conflict exists, the court must carefully evaluate

27 and compare the nature and strength of the interest of each jurisdiction in the application of

28 its own law "to determine which state's interest would be more impaired if its policy were

United States District Court

For the Northern District of California

1    subordinated to the policy of the other state," and must apply the law of the state whose

2    interest would be more impaired if its law were not applied.  See Kearney, 39 Cal. 4th at

3    107-08.

4           Defendants argue that even if the court were to conclude that California has some

5    interest in having its laws applied, Arizona's interest would be more impaired if its policy

6    were subordinated to the policy of California.  Specifically, defendants contend that

7    Arizona's interest in promoting freedom of investment and enterprise within its borders

8    would be impaired if Arizona businesses have no assurance of what laws apply to "Arizona

9    activities."  They argue that applying California law in this case would impair Arizona's

10   ability to provide the benefits and protections of its laws to Arizona businesses, while

11   applying Arizona law would not impede California's ability to protect its own citizens from

12   discrimination within the bounds of its territorial jurisdiction.

13          The basis of California's interest in applying its law in Kearney was that the principal

14   purpose of California's privacy law is to protect the privacy of confidential communications

15   of California residents while they are in California.   See Kearney, 39 Cal. 4th at 119-20.

16   Defendants argue that the nature of secretly recording a phone call enables a person to

17   reach out from another state and perform the tort of invading the privacy of a person

18   in California, but that California has no similar interest in protecting its residents' access to

19   public accommodations in other jurisdictions.  Defendants claim that in order to find that

20   California has an interest in applying the Unruh Act in this case, the court would have to

21   find that the California Legislature intended to impose a duty on foreign Internet businesses

22   to make their services available to California residents.

23          Plaintiffs, on the other hand, argue that California's interest would be more impaired

24   if California law were not applied in this case.  They argue that California's strong interest is

25   shown in this case by the facts that the principal purpose underlying the Unruh Act is the

26   protection of California residents from discrimination in California business transactions,

27   and that the Legislature has continued to modify the Act and the courts have vigorously

28   enforced it.  Plaintiffs also contend that California has a significant interest in this case

37

United States District Court

For the Northern District of California

1   because this case involves family and adoption-related issues – issues that traditionally lie

2   in the domain of the states.  Plaintiffs claim that in light of these strong public policies,

3   California's interests would be significantly impaired by the failure to apply California law.

4        Plaintiffs argue further that defendants have not shown and cannot show that

5   Arizona has an actual or significant stake in this litigation or that its interests will be

6   impaired if California law is applied.  With regard to defendants' claim that Arizona has an

7   interest in promoting "free enterprise," plaintiffs argue that defendants have not shown that

8   this alleged interest would be promoted by permitting defendants to discriminate against

9   same-sex couples.

10       In sum, plaintiffs argue that the factors that led the Kearney court to find that

11   California law applied to the recording of telephone conversations between California

12   residents and persons located in other states also apply in this action, while defendants

13   maintain that California's interest does not come into play because this case does not

14   involve discrimination against California residents in California.  Defendants submit that all

15   the activity occurred in Arizona, where defendants and ParentProfiles.com's server are

16   located.  They argue that plaintiffs, in contacting defendants via the Internet, "traveled" from

17   California to Arizona, and were therefore "in" Arizona at the time of the alleged

18   discrimination.  They argue that California has no interest in having its law applied

19   extraterritorially.

20       Defendants claim that the Kearney court's finding of a California interest that would

21   be severely impaired unless California law were applied – that is, the interest in protecting

22   individuals in California from the secret recording of confidential communications by or at

23   the behest of another party to the communication – has no relevance to the Unruh Act

24   claims at issue here.

25       Defendants contend that it is well-established that the Unruh Act cannot be invoked

26   to regulate activities conducted in another state, even though the welfare of California

27   citizens may be affected when they travel to that state.  In support, they cite Chaplin v.

28   Greyhound Lines, Inc., 1995 WL 419741 (N.D. Cal., July 3, 1995); State of Calif. Auto.

United States District Court

For the Northern District of California

1  Dismantlers Ass'n v. Interinsurance Exchange, 180 Cal. App. 3d 735 (1986); and Archibald

2  v. Cinerama Hawaiian Hotels, Inc., 73 Cal. App. 3d 152 (1977).

3        In Archibald, the plaintiff asserted that the defendant Hawai'ian hotel's policy of

4  charging California residents a higher rate than it charged Hawai'i residents was

5  discriminatory in violation of the Unruh Act.  The court found, however, that the Unruh Act,

6  by its express language, applied only within California, and could not be extended into the

7  Hawai'ian jurisdiction.  The court cited Bigelow v. Virginia, 421 U.S. 809 (1975), for the

8  proposition that a state cannot regulate or proscribe activities conducted in another state or

9  supervise the internal affairs of another state in any way, even though the welfare or health

10  of its citizens may be affected when they travel to that state.[11]  Archibald, 73 Cal. App. 3d at

11  159 (citing Bigelow, 421 U.S. at 824-25).

12        In Chaplin, the plaintiff asserted a claim under the Unruh Act for discriminatory

13  conduct that occurred while plaintiff was traveling on one of defendant's buses in Texas.

14  The court repeated the holding from Archibald (the language taken from Bigelow) that a

15  state cannot regulate or proscribe actions conducted in another state, even though the

16  welfare or health of its citizens may be affected when they travel to that state.  Chaplin,

17  1995 WL 419741 at *5 (citing Archibald, 73 Cal. App. 3d at 159).  Similarly, in Auto

18  Dismantlers, the court relied on Archibald and Bigelow to support its ruling that licensed

19  auto dismantlers could not seek to have California dismantling laws applied to buyers who

20  took vehicles out of the state to dismantle them.  Auto Dismantlers, 180 Cal. App. 3d at

21  746.

22        Defendants argue that just as in Archibald, Chaplin, and Auto Dismantlers, this case

23  ────────────────

24        [11]   Bigelow was a First Amendment case, in which a Virginia newspaper editor
   challenged his conviction in Virginia for the crime of "encouraging or prompting the procuring
25  of an abortion."  The editor had published an advertisement indicating that abortion was legal
   in New York and that there was no residency requirement.  It was in that context that the
26  Supreme Court noted that Virginia possessed no authority to regulate services provided in
   New York, and observed that "[a] State does not acquire power or supervision over the internal
27  affairs of another State merely because the welfare and health of its own citizens may be
   affected when they travel to that State . . . [and] may not, under the guise of exercising internal
28  police powers, bar a citizen of another State from disseminating information about an activity
   that is legal in that State."  Bigelow, 421 U.S. at 824-25.

United States District Court

For the Northern District of California

1    involves a wholly "extraterritorial" application of the Unruh Act to "conduct taking place

2    outside the state."  Defendants contend that plaintiffs have provided no evidence of any

3    activity of any specific defendant <u>within California</u> that would provide the basis for the

4    lawsuit.  They claim that they have never contacted the plaintiffs, and that the only

5    connection the events have with California is that the plaintiffs live in California and

6    attempted, from California, to do business with an Arizona business.

7         Defendants also dispute plaintiffs' assertion that defendants have "actively and

8    consistently court[ed] California consumers and businesses."  They claim that the

9    undisputed facts in the summary judgment record show no evidence that Adoption Profiles

10   LLC has ever solicited a California consumer or business.  Defendants assert that as of the

11   filing of this lawsuit, Adoption Profiles had done less than $38,000 worth of business with

12   California residents.

13        Thus, according to defendants, California has <u>no interest</u> in applying the Unruh Act

14   to Adoption Profiles' Arizona policy of "publishing," via its Arizona servers, potential

15   adoptive parent profiles of married husbands and wives only.

16        Plaintiffs on the other hand argue that defendants' combined physical and virtual

17   presence in California is substantial and significant, warranting application of California law

18   in the present case.  They contend that defendants should not be permitted to escape

19   liability for injury they have caused simply because their offices are physically located in

20   another state, and note that the court previously rejected defendants' assertion that all the

21   actions of which plaintiffs complain occurred in Arizona, and that the court found that

22   plaintiffs' claims arise directly from defendants' California-related contacts.

23        Where an out-of-state business solicits California customers and does business with

24   customers living in California, California has an interest in ensuring that the out-of-state

25   business does not discriminate against the California customers.  Contrary to defendants'

26   arguments, this is not a case that involves extraterritorial application of California law, as

27   did the case against the Hawai'ian hotel in <u>Archibald</u>; or the case against Greyhound based

28   on the incident at the Texas bus terminal in <u>Chaplin</u>; or the case against the insurance

United States District Court

For the Northern District of California

1    company in Auto Dismantlers.

2         Archibald and Chaplin were brought by California residents seeking the protections

3    of the Unruh Act in connection with events occurring when the California residents were

4    physically located in other states.  Auto Dismantlers involved an attempt to apply California

5    law to the dismantling of automobiles outside of California's borders.  By contrast,

6    defendants in this case discriminated against California residents in California – not in

7    Arizona or in any other state.  Plaintiffs in this case were not in Arizona when the Gwilliams

8    and the Adoption.com partnership refused to do business with them.  As residents of

9    California, they have been present in California from October 2002 until the present.

10   Defendants have not cited any case in which a court has declined to apply California law to

11   an out-of-state business that intentionally solicits California customers and intentionally

12   harms California residents in California, in violation of California law.

13        In Kearney, SSB also argued that the plaintiffs there were seeking to impose

14   California law on activities conducted outside of California, as to which California had no

15   legitimate or sufficient state interest.  The California Supreme Court rejected SSB's

16   argument, stating that the case was based on SSB's policy and practice of recording

17   telephone calls of California clients, while the clients were in California, without the clients'

18   knowledge or consent; and held that California had an interest in protecting the privacy of

19   telephone conversations of California residents while they were in California that was

20   sufficient to permit California to exercise legislative jurisdiction over such activity.  Kearney,

21   39 Cal. 4th at 104-05.

22        The Kearney court distinguished the situation in which California law is applied to

23   out-of-state businesses to protect California residents while they are in California, from the

24   situation in which California "would be applying its law in order to defeat a defendant's

25   conduct in another state vis-à-vis another state's residents" or to "alter [a company's]

26   nationwide policy."  Id. at 104.

27        Plaintiffs argue that the same reasoning applies in the present case, because the

28   Butlers' claim is based on defendants' acknowledged policy and practice of applying its

41

**United States District Court**
For the Northern District of California

discriminatory policy to California residents, while such residents were in California.  They

claim that just as in <u>Kearney</u>, defendants' conduct here constitutes a "multi-state event" in

which a crucial element – denial of services to California residents – occurred in California

after defendants engaged in substantial and continuous efforts to attract California

consumers.

The <u>Kearney</u> court found, with regard to the impairment of California's interest, that

the failure to apply California law in that case would "substantially undermine the protection

afforded by the statute" because it would permit out-of-state companies doing business in

California to invade the privacy of California residents in contravention of California law.

> Many companies who do business in California are national or international
> firms that have headquarters, administrative offices, or – in view of the recent
> trend toward outsourcing – at least telephone operators located outside of
> California.  If businesses could maintain a regular practice of secretly
> recording all telephone conversations with their California clients or customers
> at which the business employee is located outside of California, that practice
> would represent a significant inroad into the privacy interest that the statute
> was intended to protect.

<u>Id.</u> at 126.

The court finds that the failure to apply California law in the present case would

undermine the Unruh Act for the same reasons.  If businesses with headquarters in other

states could maintain a regular practice of discriminating against California residents, that

practice would substantially impair the protection afforded by the statute.

The court is not persuaded by defendants' argument that Arizona's interests would

be seriously impaired by applying California law.  In <u>Kearney</u>, the court found that because

California law was more protective of privacy interests than the comparable Georgia

statute, "the application of California law would not violate any interest protected by

Georgia law."  <u>Id.</u> at 126-27.  Moreover, the court noted, because there was "nothing in

Georgia law that <u>requires</u> any person or business to record a telephone call without

providing notice to the other parties to the call, . . . persons could comply with Georgia law

without violating any provision of Georgia law."  <u>Id.</u> at 127.

Similarly, in the present case, the Unruh Act is more protective of consumers than

**United States District Court**
For the Northern District of California

1    the comparable Arizona law.  Application of California law would not violate any right

2    protected by Arizona law, and the Unruh Act merely provides protections in addition to

3    those specifically enumerated protections in Arizona.  Arizona law does not require, or even

4    permit, discrimination by businesses against same-sex couples.

5            Thus, defendants can comply with California law while doing business in California

6    without violating any provision of Arizona law, and any interest Arizona may have in its own

7    law would not be seriously impaired by the application of California law.  As in <u>Kearney</u>,

8    where the court found that it would be feasible for a business located outside California to

9    identify the calls that its employees were making to California residents, or were taking from

10   California residents, it would be feasible in the present case for defendants to identify those

11   potential customers of ParentProfiles.com who were living in, and certified to adopt in,

12   California.

13           In a final argument, defendants contend that applying California law to regulate the

14   policies of foreign Internet businesses would be a direct regulation of interstate commerce

15   (citing <u>American Civil Liberties Union v. Johnson</u>, 194 F.3d 1149, 1160-61 (10th Cir. 1999);

16   <u>American Booksellers Found. v. Dean</u>, 342 F.3d 96, 102, 104 (2d Cir. 2003); <u>PSINet, Inc. v.</u>

17   <u>Chapman</u>, 362 F.3d 227, 239-40 (4th Cir. 2004)).  They claim that there is no justification

18   for permitting one state to exert such control over the Internet.

19           Defendants raised this same argument in their original motion to dismiss, filed in

20   April 2004.  In the order denying that motion, the court specifically distinguished the cases

21   cited by defendants in this motion – <u>American Booksellers Found. v. Dean</u>, <u>ACLU v.</u>

22   <u>Johnson</u>, and <u>PSINet v. Chapman</u> – on the basis that each of those cases dealt with

23   statutes that addressed Internet activities – specifically, laws prohibiting the dissemination

24   of material harmful to minors via the Internet.  The court then noted that, by contrast, the

25   Unruh Act is an anti-discrimination statute that contains no reference to Internet-content

26   distribution, and thus, on its face, places no burden on interstate commerce.  <u>See</u> Order,

27   May 3, 2004, at 17-18.

28           Moreover, defendants have provided no evidence that the application of California

United States District Court

For the Northern District of California

1   law would pose an undue and excessive burden on interstate commerce by making it

2   impossible or infeasible for defendants to comply with the requirements of the Unruh Act

3   without altering their conduct with regard to ParentProfiles.com's non-California clients.

4       In Kearney, the application of California law to the out-of-state defendant was

5   "limited to the defendant's surreptitious or undisclosed recording of words spoken over the

6   telephone by California residents while they are in California."  Kearney, 39 Cal. 4th at 104.

7   As plaintiffs point out, the same geographic limitation applies in the present case, as they

8   are seeking to prevent defendants from discriminating against California residents while

9   they are in California.  The evidence shows that defendants already require all persons who

10  wish to use the ParentProfiles service to identify their state of residence and where they are

11  certified to adopt.  Thus, defendants can easily distinguish California residents from others,

12  and the application of California law will not require defendants to alter their policy or

13  practice with regard to residents of other states.

14          2.      The Unruh Act Claims

15      Plaintiffs allege in the second amended complaint that defendants' refusal to offer

16  same-sex domestic partners the adoption-related services on ParentProfiles.com, on the

17  same terms and conditions offered married couples, constitutes unlawful discrimination on

18  the basis of marital status, sexual orientation, and sex, in violation of the Unruh Act.

19      Plaintiffs seek summary judgment on the issue of liability against Dale Gwilliam,

20  Nathan Gwilliam, Adoption.com (the partnership), and Adoption Profiles, LLC.  Defendants

21  also seek summary judgment, arguing that Adoption.com (the partnership) did not violate

22  the Unruh Act in 2002, and that the injunctive relief sought by plaintiffs under the Unruh Act

23  is unconstitutional.

24              a.      Liability under the Unruh Act

25      Plaintiffs argue that the Adoption.com partnership, and Dale Gwilliam and Nathan

26  Gwilliam as general partners, were directly liable for violating the Unruh Act in 2002

27  because the partnership was the owner of the ParentProfiles.com website when plaintiffs

28  were denied access to the ParentProfiles services.  Plaintiffs assert that Adoption Profiles

United States District Court
For the Northern District of California

1    LLC is directly liable for the continuing violation of the Unruh Act as the current owner of

2    ParentProfiles.com, which continues to discriminate against the plaintiffs and other same-

3    sex couples, and that Dale and Nathan are also liable for discriminating against plaintiffs in

4    connection with their role as managers of Adoption Profiles LLC.

5                                   i.    marital status

6            Defendants argue that plaintiffs' application was denied solely because they were

7    not married, and that plaintiffs were treated no differently than other unmarried couples who

8    sought to post their profiles on ParentProfiles.com.  They also assert that the Adoption.com

9    partnership cannot be liable for discrimination on the basis of marital status in connection

10   with the October 2002 denial of plaintiffs' application because the Unruh Act did not prohibit

11   marital status discrimination against registered domestic partners until January 1, 2005.

12           Plaintiffs contend, however, that defendants' refusal to provide equal benefits and

13   services to registered domestic partners discriminates on the basis of marital status, and

14   did so in October 2002.  They argue that the distinction made by the Koebke court between

15   pre-2005 and post-2005 conduct does not apply in this case because the plaintiffs there

16   were not registered domestic partners at the time the defendant country club initially denied

17   their request for equal access to the services provided to married members.

18           They also assert that marital status has been a protected category under the Unruh

19   Act for well over two decades.  In support, they cite to Marina Point, in which the California

20   Supreme Court cited an opinion of the California Attorney General stating that

21   discrimination in rental housing on the basis of occupation, marital status, and number of

22   children would violate the Unruh Act.  See Marina Point, 30 Cal. 3d at 736 (citing 58 Ops.

23   Cal. Atty. Gen. 608, 613 (1975)).

24           In Kearney, the California Supreme Court found that California law applied under the

25   facts of the case.  However, with regard to the question of damages for conduct pre-dating

26   the court's decision on the choice-of-law question, the court found that it would "maximize

27   each affected state's interest to the extent feasible" to restrain the application of California

28   law with regard to the imposition of liability for acts that occurred in the past in order to

                                            45

United States District Court

For the Northern District of California

1  accommodate Georgia's interest in protecting persons who acted in Georgia in reasonable

2  reliance on Georgia's law from being subjected to liability on the basis of such an action.

3  Kearney, 39 Cal. 4th at 128-31.

4      The court based its decision not to apply California law to SSB's past actions on two

5  considerations.  The court noted the existence of conflicting lower court decisions from

6  various jurisdictions, which might have given SSB cause to believe that Georgia law would

7  apply to the recording of a telephone conversation between a person in Georgia and a

8  person in California.  The court also found that the damages for invasion of privacy might

9  prove difficult to calculate.

10     Plaintiffs argue that the facts in this case do not warrant a result similar to the result

11  in Kearney, because there are no conflicting decisions on point from other states.  They

12  contend that the relevant facts in this case are more like the facts in Bernhard, where the

13  court found that California's dramshop-liability law applied to impose liability on a Nevada

14  tavern owner who had served alcohol to an intoxicated patron, after that intoxicated

15  individual injured a California resident in an automobile accident in California.  The court's

16  ruling was based in part on a finding that the tavern owner had actively solicited California

17  patronage.  Bernhard, 16 Cal. 3d at 322-23.

18     Plaintiffs also assert that unlike the uncertain and potentially massive damages at

19  issue in Kearney, plaintiffs' damages under the Unruh Act are set by statute and are

20  minimal in the context of this dispute.  In addition, they contend, unlike the violations of

21  California law alleged in Kearney, the violations in this case are ongoing, as defendants

22  have refused to alter their discriminatory policy, which they continue to apply to the Butlers

23  and to other California residents.  Plaintiffs contend that awarding damages will have a

24  deterrent effect, but will not significantly impair any Arizona interest.

25     Defendants maintain that their consistent practice of requiring all customers to agree

26  to Arizona law and venue limits the foreseeability of being subjected to liability under

27  California law for actions that are lawful under Arizona law.  They claim that Arizona's

28  interest in protecting Arizona companies from liability for reasonable reliance on Arizona

United States District Court
For the Northern District of California

1    law could certainly by impaired if California law were applied in this case.

2         The question as the court sees it, however, is not whether defendants in this case

3    should have reasonably relied on Arizona law.  Unlike the dispute in Kearney regarding the

4    application of the California statute, this case presents no conflicting decisions on point

5    from other jurisdictions.  As plaintiffs point out, the relevant facts in this case are more like

6    the facts in Bernhard.  Defendants in this case have actively sought business connections

7    with Californian consumers, and as of October 2002, their Internet business was more

8    closely tied to California than to any other state (based on the profiles posted by residents

9    of various states).  California has a strong interest in regulating defendants' activities

10   because of defendants' penetration into the California economy, and the likelihood of

11   exposure for violating California law was a foreseeable and reasonable business expense.

12        As explained in some detail above, the question whether the Unruh Act prohibited

13   marital status discrimination was not completely resolved in 2002.  In 2005, however, the

14   California Legislature clearly stated its agreement with the California Supreme Court's

15   rulings, going back 35 years, that the categories listed in the Unruh Act should be

16   considered illustrative rather than restrictive; and also "affirmed" that the bases of

17   discrimination prohibited by the Unruh Act include marital status and sexual orientation.

18        Defendants assert that plaintiffs' application to post their profile was denied in

19   October 2002 pursuant to a policy that only opposite-sex married couples should be

20   permitted to use the ParentProfiles service.  They claim that this policy was applied evenly

21   and was not personal to plaintiffs.  The court finds that there is a triable issue as to whether

22   the policy of not allowing unmarried couples to post profiles on ParentProfiles.com amounts

23   to marital status discrimination.

24        The court finds, given the status of California law in 2002, that defendants should not

25   be subjected to damages for marital status discrimination in connection with their rejection

26   of plaintiffs' application.  However, the claim for injunctive relief can go forward.

27                             ii.    sexual orientation

28        Defendants argue that there is no evidence that their "married-couples-only" policy

47

United States District Court
For the Northern District of California

discriminated on the basis of sexual orientation.  They contend that their "editorial policy"

focusing on adoption by married couples cannot be used to infer an intent to discriminate

because it disparately impacts same-sex couples, because the Unruh Act prohibits only

intentional discrimination.  They also claim that Adoption Profiles LLC has legitimate

business reasons for its policy; and that the ParentProfiles.com website is not a "business

establishment" because it is a vehicle for "publishing" the Gwilliams' opinion that children

should be adopted by heterosexual married couples only.[12]

In response, plaintiffs contend that defendants are operating a public business, and

do not have the option under the Unruh Act to violate the law based on their own beliefs.

The also assert that defendants' allegedly neutral policy was and is applied in a

discriminatory manner.  They argue that the policy was applied in a discriminatory fashion

in 2002, by virtue of the fact that defendants made exceptions to their policy for single

people, but not for same-sex couples. They also assert that defendants have admitted that

they do not provide services to gays and lesbians.

The court is not persuaded by defendants' claim that ParentProfiles.com is not a

"business establishment."  As described herein, the ParentProfiles.com website is plainly a

business establishment as defined under California law.  See Isbister, 40 Cal. 3d at 78-79

(in enacting the Unruh Act, the Legislature intended that "business establishments" be

interpreted in the broadest sense reasonably possible).

With regard to the claim that Adoption Profiles LLC has legitimate business reasons

for its "married-couples-only" policy – which the court notes appears to conflict with the

claim that ParentProfiles.com is not a "business establishment" – the court finds that

_____

[12]  Defendants also attempt to distinguish Koebke on the basis that the policy of the country club was solely commercial, whereas the "editorial policy" of the defendants is to promote adoption by heterosexual married couples, and is based on the defendants' protected rights to freedom of thought, conscience, religion, belief, and expression, which they assert are recognized defenses under the Unruh Act.  In support, they cite North Coast Women's Care Med. Group, Inc. v. Superior Court, 40 Cal. Rptr. 3d 636 (2006).  The California Supreme Court granted review in that case on June 14, 2006, however, and the opinion therefore cannot be cited.  See North Coast Women's Med. Group, Inc. v. Superior Court, 139 P.3d 1, 46 Cal. Rptr. 3d 605 (Cal. 2006).  In addition, plaintiffs assert that defendants denied in their depositions that their policy is based on their religious or philosophical beliefs.

United States District Court

For the Northern District of California

1    defendants have not actually articulated any such legitimate business reason.

2        Defendants assert that the Gwilliams believe it is in the best interests of infants to be

3    placed for adoption with a married mother and father, and that anyone involved in adoption-

4    related activities should act in the best interests of children.  This is not a "business

5    reason."  The Gwilliams and the Adoption.com partnership were not in the business of

6    arranging adoptions in 2002, and Adoption Profiles LLC has not been in that business

7    during the period beginning in January 2003.  Defendants sell products and services that

8    are of interest to people who are seeking to adopt or who have recently adopted, but their

9    own beliefs regarding the suitability of certain prospective parents over others have little

10   relevance to the conduct of their business.

11       With regard to the merits of the claim of discrimination on the basis of sexual

12   orientation, defendants are correct that a claim of disparate effect cannot proceed under

13   the Unruh Act.  Thus, to the extent that plaintiffs may be arguing that defendants' married-

14   couples-only policy is facially discriminatory because it has the effect of discriminating on

15   the basis of sexual orientation, that claim is barred.  See Koebke, 36 Cal. 4th at 853-54;

16   Harris, 52 Cal. 3d at 1170-74.

17       With regard to disparate treatment on the basis of sexual orientation –  the claim that

18   the Gwilliams and Adoption.com (the partnership) rejected plaintiffs' application to post their

19   profile on ParentProfiles.com because plaintiffs are not heterosexual, and that Adoption

20   Profiles continued the policy for the same reason after January 2003 – the court finds that

21   disputed issues of material fact preclude summary judgment, and that the claim must be

22   tried to a jury.  For example, the evidence suggests that the policy may not have been

23   applied evenly; and also raises questions with regard to whether the Gwilliams developed

24   the "married-couples-only" policy because they are biased toward gays and lesbians, and

25   whether the employees of the Adoption.com partnership and the LLCs advocated and

26   enforced the defendants' policy with a discriminatory motive.

27                              iii.    sex

28       Defendants argue that there is no evidence in the record showing that they treated

49

United States District Court

For the Northern District of California

1    men and women unequally.  They submit that no California court has ever found sex

2    discrimination under the Unruh Act absent evidence of preferential treatment of one sex

3    over the other.

4         Plaintiffs assert, however, that by mandating that each of the individual prospective

5    parents be in a relationship with a person of the opposite sex, defendants have

6    discriminated on the basis of the sex of the person with whom each of the individuals

7    associates.

8         There is no dispute that the Unruh Act has long prohibited discrimination on the

9    basis of sex.  However, the court is hard-pressed to find any distinction between the sex

10   discrimination claim as described by plaintiffs in their own motion and in their opposition to

11   defendants' motion, and the claim that defendants discriminated against plaintiffs based on

12   sexual orientation.  To the extent that plaintiffs are able to articulate a difference, this claim

13   may also be tried to the jury.

14              *b.*     *Propriety of Injunctive Relief*

15        Defendants argue that the injunctive relief sought by plaintiffs is not appropriate for

16   two reasons.  They contend that the proposed injunction would violate their constitutional

17   rights, and that plaintiffs cannot obtain an injunction based on the 2005 amendment to the

18   Unruh Act because there has been no ongoing relationship between plaintiffs and

19   defendants since plaintiffs' application was rejected in October 2002.

20        With regard to the constitutional argument, defendants assert that plaintiffs are

21   seeking to use California law to compel Adoption Profiles LLC to accept for "publication" on

22   its websites adoption information that is inconsistent with the purposes for which the

23   website is operated, which defendants claim is to promote adoption by married husband

24   and wife couples.  Defendants argue that using the courts to compel a "private publisher" to

25   "grant access to its Internet publications" for the speech of another private party violates the

26   free speech protections of the California Constitution and the First Amendment to the

27   United States Constitution.

28        Defendants contend that this issue is controlled by the U.S. Supreme Court's

United States District Court

For the Northern District of California

decision in <u>Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston</u>, 515 U.S. 557 (1995).  In that case, the Irish-American Gay, Lesbian and Bisexual Group of Boston sued for sexual orientation discrimination under a Massachusetts law similar to the Unruh Act, after the organizers of a private St. Patrick's Day parade refused to let the group march in their parade.  The Massachusetts state court ruled in the plaintiff group's favor, but the U.S. Supreme Court found that the compelled inclusion of the group unconstitutionally interfered with the freedom of expression of the private parade organizers.

Defendants claim that compelling them to post plaintiffs' profiles on their "web publication" ParentProfiles.com would similarly constitute compelled speech, and would also interfere with their constitutional right to decide what not to say.  They argue, in essence, that their website ParentProfiles constitutes "expressive speech," and that just as a newspaper cannot be compelled to publish particular writings by outsiders, defendants cannot be compelled to publish plaintiffs' "writings."

Defendants maintain that the fact that they accept money for posting the profiles does not change the analysis, because newspapers also accept money for printing advertisements, but cannot be compelled to accept every advertisement that anyone wants to have printed.  They claim that the speech on the ParentProfiles.com website is not commercial speech because it does not propose commercial transactions (as accepting money for adoptions would constitute the unlawful selling of babies).  They assert that civil rights laws cannot be used to compel people to change their speech.

In response, plaintiffs argue that defendants do not have a First Amendment right to engage in discriminatory conduct, and that statutes prohibiting discrimination in public accommodation do not violate the First Amendment because they are not aimed at the suppression of speech.  They contend that the Unruh Act affects what defendants must do to engage in business activities in California – refrain from engaging in discrimination – not what defendants may say or not say regarding their beliefs about gay people, adoption, marriage, or parenting.  They claim the Unruh Act does not require defendants to espouse or denounce any particular viewpoint, but rather to refrain from discriminatory conduct.

**United States District Court**
For the Northern District of California

1  Plaintiffs contend that under defendants' view, any business that claimed ideological

2  opposition to serving women, African-Americans, gays and lesbians, or people with

3  disabilities would be entitled to do so on First Amendment grounds, simply by asserting that

4  they wished to "send a message."  Plaintiffs assert that if defendants' position were correct,

5  it would eviscerate governments' ability to eliminate discrimination.

6      Finally, plaintiffs argue that any speech that is incidentally affected by application of

7  the Unruh Act is commercial speech at best, and note that commercial speech does not

8  receive the same level of constitutional protection as other types of protected speech.

9  Plaintiffs claim that the only expression by defendants on ParentProfiles.com is related to

10  the commercial advertising services they provide to prospective parents, and that any

11  conduct or decision associated with such speech is properly considered commercial

12  speech.

13      The court finds that defendants' argument is without merit.  The defendants in the

14  present case are selling adoption-related services.  It is undisputed that none of the

15  defendants is a licensed adoption agency, and that none of the defendants is authorized by

16  any state to pass on the fitness of any person to become an adoptive parent.  The

17  Gwilliams operate various adoption-related commercial enterprises via the Internet.  Some

18  of these enterprises offer information and advice regarding adoption to Internet users

19  without charge.  Others offer adoption-related merchandise for sale.

20      The website ParentProfiles.com is not "expressive speech."  It is a commercial

21  enterprise, consisting of a website where prospective parents post profiles for a fee.

22  Indeed, ParentProfiles.com is more akin to a commercial Internet dating service than it is to

23  an Internet "publication."  The "service" requires that the prospective parents be pre-

24  approved for adoption by the appropriate agency in their own states of residence, but apart

25  from that, it operates as any matchmaking service.  Just as the operators of Internet dating

26  services do not schedule dates or perform marriages, but rather simply provide interested

27  individuals with a vehicle for making contact and arranging introductions, the operators of

28  ParentProfiles.com do not preside over meetings between birth mothers and prospective

**United States District Court**
For the Northern District of California

1  adoptive parents, and do not broker or arrange any adoptions.  The website simply

2  provides an opportunity for prospective parents – for a fee – to post information about

3  themselves on a website in the hope that a birth mother will select them as the adoptive

4  parents for their babies.

5  Nor is it "undisputed" that defendants are "Internet publishers."  The language in the

6  profiles that are posted on the site is not defendants' language – it is the language of

7  defendants' paying customers.  Simply "publishing" information written by prospective

8  parents does not suffice to transform defendants' discriminatory conduct into "speech

9  itself."  Plaintiffs are not seeking to place any restrictions on what <u>defendants</u> are permitted

10  to say or to compel them to say anything.  It is the discriminatory conduct that is at issue

11  here – defendants' refusal to do business with plaintiffs, based on their sexual orientation

12  and/or marital status.  The key component of defendants' business is the selling of

13  adoption-related services to the public, and the fact that there may be some speech

14  involved in that business does not entitle them to First Amendment protection.

15  The Supreme Court found that the organizer of the parade in <u>Hurley</u> was an

16  expressive organization carrying on an expressive activity.  The Court made clear,

17  however, that anti-discrimination laws do not, as a general matter, violate the First or

18  Fourteenth Amendments, because such laws generally do not "target speech" but rather

19  prohibit "the act of discriminating."  <u>Hurley</u>, 515 U.S. at 572; <u>see also</u> <u>Roberts v. U.S.</u>

20  <u>Jaycees</u>, 468 U.S. 609, 623-24 (1984) (statutes prohibiting discrimination in public

21  accommodation do not violate the First Amendment because they are not aimed at

22  suppression of speech).  Defendants cite no reported decision extending the holding of

23  <u>Hurley</u> to a commercial enterprise carrying on a commercial activity.

24  The Supreme Court recently further clarified the distinction between regulating

25  conduct and speech in <u>Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.</u>, 547 U.S. 47, 126

26  S.Ct. 1297 (2006), where it rejected the argument that a federal law requiring law schools

27  to give access to military recruiters violated the schools' First Amendment rights.

28  Commenting that "[l]aw schools remain free under the statute to express whatever views

United States District Court
For the Northern District of California

1   they may have on the military's congressionally mandated employment policy," the Court

2   found that, as a general matter, the federal law at issue "regulates conduct, not speech."

3   Id., 126 S.Ct. at 1307.

4          Moreover, even if the ParentProfiles.com website were deemed to have some

5   expressive component, defendants still cannot prevail in their First Amendment argument.

6   Under the test set forth in United States v. O'Brien, 391 U.S. 367 (1968), a governmental

7   regulation that places a burden on expressive activity is sufficiently justified if it is within the

8   constitutional power of the government, if it furthers an important or substantial

9   governmental interest, and if the incidental restrictions on alleged First Amendment

10  freedoms are no greater than is essential to the furtherance of that interest.  Id. at 377.  In

11  this case, California has the constitutional authority to bar discrimination on the basis of

12  sexual orientation in public accommodations, California's interest in combating

13  discrimination on the basis of sexual orientation is compelling, and the Unruh Act prohibits

14  such discrimination in order to eliminate the harms caused by the discriminatory conduct,

15  not to silence particular viewpoints.

16         Defendants' second argument is that plaintiffs cannot state a present cause of action

17  for injunctive relief with regard to the claim of marital status discrimination.  They assert that

18  an injunction based on a change in law presumes the existence of an ongoing relationship

19  over which the court has jurisdiction, but where, as here, the rejection of plaintiffs'

20  application was not unlawful in October 2002, and there was no ongoing relationship

21  between plaintiffs and the defendants, plaintiffs cannot obtain injunctive relief.

22         In support, defendants cite White v. Davis, 13 Cal. 3d 757 (1975), and American

23  Fruit Growers v. Parker, 22 Cal. 2d 513 (1943).  In White, the plaintiff – a University of

24  California history professor and a taxpayer – filed a taxpayer's suit to enjoin the Chief of the

25  Los Angeles Police Department from spending public funds in connection with the police

26  department's conduct of covert intelligence gathering activities at UCLA.  Among other

27  things, the complaint alleged that the challenged conduct violated students' and teachers'

28  constitutional right to privacy.  Shortly after the trial court sustained the defendant's

United States District Court

For the Northern District of California

1   demurrer, the voters amended Article I, Section 1 of the California Constitution to provide

2   explicit protection to every individual's interest in "privacy."

3        The court of appeal noted that although the new constitutional provision had not

4   been adopted until after the filing of the lawsuit, the complaint nonetheless stated a prima

5   facie violation of the constitutional right of privacy.  White, 13 Cal. 3d at 776.  The court

6   found the provision controlling on the appeal because the complaint sought only injunctive

7   relief to restrain the continuation of the alleged surveillance and data collecting practice in

8   the future.  The court cited American Fruit Growers for the proposition that "[r]elief by

9   injunction operates in futuro, and the right to it must be determined as of the date of the

10   decision by an appellate court."  White, 13 Cal. 3d at 773 n.8 (citing American Fruit

11   Growers, 22 Cal. 2d at 515).

12        The court does not agree that the principle stated in White bars plaintiffs' claim for

13   injunctive relief in this case.  White does not stand for the proposition that an injunction

14   based on a change in law presumes the existence of an ongoing relationship over which

15   the court has jurisdiction.  White simply holds that an appellate court must apply the law in

16   effect at the time it issues its opinion in a case.

17        3.        Unfair Competition and Misleading Advertising Claims

18        The court finds that both claims brought under California Business & Professions

19   Code must be dismissed.  Plaintiffs have indicated their intention to dismiss the claim

20   brought under § 17500, and the § 17200 claim must be dismissed for lack of standing.

21        California law previously permitted any person acting for the general public to sue for

22   relief from unfair competition.  See Californians for Disability Rights v. Mervyn's, LLC, 39

23   Cal. 4th 223, 227 (2006).  Proposition 64, which was passed by the voters on November 2,

24   2004, amended California's unfair competition law to require that any plaintiff have

25   "suffered injury in fact and [have] lost money or property as a result of . . . unfair

26   competition."  Cal. Bus. & Prof. Code § 17203, as amended by Prop. 64 § 2; Id. § 17204,

27   as amended by Prop. 64 § 3.  In CDR, the California Supreme Court held that these new

28   requirements apply to cases pending at the time the proposition became effective.  CDR,

United States District Court

For the Northern District of California

1  39 Cal. 4th at 232-33.

2  Defendants argue that the California Supreme Court's decision in CDR eliminates

3  plaintiffs' unfair competition claim.  Defendants contend that it is undisputed that plaintiffs

4  have not "lost money or property as a result of" any conduct at issue in this litigation, noting

5  that neither the first amended complaint nor the second amended complaint contains any

6  such allegation, and that plaintiffs have never produced any evidence showing that they

7  "lost money or property as a result of" defendants' actions.

8  In response, plaintiffs argue that while Proposition 64 eliminated the standing of

9  certain plaintiffs to bring unfair competition claims, it did not affect their standing in this

10  case.  Plaintiffs argue that even though the California Supreme Court has ruled that

11  Proposition 64 is retroactive, plaintiffs – as injured parties here – can still pursue their

12  claims as individuals (rather than as private attorneys general).  Plaintiffs assert that they

13  do not plan to seek class certification in this case and intend to seek an injunction based on

14  their personal injury.

15  Plaintiffs submit that unlike the plaintiffs in CDR, and its companion case, Branick v.

16  Downey Sav. & Loan Ass'n, 39 Cal. 4th 235 (2006) – none of whom could allege any direct

17  personal injury as a result of the actions of the defendants in those cases – they (plaintiffs

18  here) have been injured by defendants' business practices, and thus have standing to sue

19  to enjoin those practices.

20  Plaintiffs contend that they have suffered both "injury in fact" and a "loss of money or

21  property" as a result of defendants' conduct.  Plaintiffs claim that they have been injured in

22  fact by defendants' unlawful denial of access to defendants' business services and their

23  false and misleading statements regarding those services, and that they continue to suffer

24  the ongoing stigmatizing injury that defendants' actions have caused.

25  Plaintiffs also note that while they seek statutory damages rather than compensatory

26  damages, they did expend time and money preparing and submitting their application to

27  defendants, only to have defendants refuse to allow them to use defendants' business

28  services.  They contend that this economic loss is sufficient to support standing under

56

United States District Court
For the Northern District of California

1  § 17200.

2        The court finds, however, that plaintiffs do not have standing to assert the

3  § 17200 claim.  The court agrees with defendants, who argue that statutory damages

4  cannot be considered a "loss of money or property."  As defendants point out, plaintiffs

5  have not previously identified any loss of money or property in connection with their unfair

6  competition claims, and cannot now attempt to establish such a loss.  Plaintiffs have

7  previously taken the position that they should not be required to respond to deposition

8  questions regarding damages, for the reason that they had disclaimed any claim to

9  damages other than the statutory minimum.

10       Moreover, plaintiffs' expenditure of time and money preparing an application is not

11  the kind of loss of money or property that is necessary for standing under the new version

12  of the unfair competition law.   Restitution, which is the only monetary recovery possible

13  under § 17200, involves the payment or return of money or property that belongs to the

14  plaintiff.  See, e.g., Montecino v. Spherion Corp., 427 F.Supp. 2d 965, 967 (C.D. Cal.

15  2006).  The time and expenditure of preparing the application to ParentProfiles is not the

16  type of loss of money or property that is necessary for standing under § 17200.

17       4.     Successor Liability and Alter Ego

18             a.     Plaintiffs' Allegations as to Successor Liability and Alter Ego

19       Plaintiffs allege in the second amended complaint that Adoption Media LLC and

20  Adoption Profiles LLC are the successors-in-interest of Adoption.com (the partnership) and

21  its general partners Dale and Nathan Gwilliam.  They also assert that each defendant is the

22  alter ego of the other defendants.

23       In October 2002, when defendants refused to post plaintiffs' profile on

24  ParentProfiles.com, the general partnership Adoption.com, consisting of Dale and Nathan,

25  owned the vast majority of the adoption-related websites operated by the Gwilliams.

26  Between that time and June 2003, Dale and Nathan created the two LLCs, transferred

27  ownership of the partnership's websites to the LLCs (while leaving the partnership in

28  place), created the corporations, and transferred the membership interests in the LLC's

United States District Court

For the Northern District of California

1  from themselves, as sole members of the LLCs, to the corporations.

2       Plaintiffs assert that in so doing, defendants erected a complex array of corporate

3  structures that involve only two people – Dale Gwilliam and Nathan Gwilliam.  Plaintiffs

4  allege that the two LLCs are the successors-in-interest of the Adoption.com partnership

5  and its partners.  Plaintiffs assert that the LLCs received two vital assets from the general

6  partnership – the Adoption.com website and the  ParentProfiles.com website.  They note

7  that Dale and Nathan, the sole general partners of the general partnership, were also at

8  that time the sole members and officers of the LLCs, and claim that this resulted in a mere

9  continuation of ownership and control over day-to-day operations of all broad policy

10  decisions regarding the websites.

11      Plaintiffs also argue that the business entity defendants are all alter egos of the

12  Gwilliams because the Gwilliams have failed to maintain the separateness among the

13  various entity defendants, and have often confused the various entities.  Plaintiffs assert

14  that it was the intent of the Gwilliams to create a business structure in which no single entity

15  or individual can be held responsible for the October 2002 decision not to allow plaintiffs to

16  post their profile on ParentProfiles.com, or for the current policy of not allowing same-sex

17  couples to post on ParentProfiles.com.

18           *b.*     *Defendants' Motion*

19      Defendants seek summary judgment on the claims of successor and alter ego

20  liability.  Both plaintiffs and defendants argue, however, that an inquiry into successor and

21  alter ego liability would be superfluous – though for different reasons.  Plaintiffs contend

22  that there is no need to consider successor and alter ego liability because four of the

23  defendants – Dale Gwilliam, Nathan Gwilliam, Adoption.com (the partnership), and

24  Adoption Profiles LLC – are directly liable for violations of the Unruh Act.  Plaintiffs claim

25  that each of these defendants affirmatively made the decision to discriminate in violation of

26  the Unruh Act because of their consistent application of the discriminatory policy and

27  express rejection of same-sex couples.

28      Defendants, on the other hand, contend that the inquiry would be superfluous

United States District Court
For the Northern District of California

1   because the court does not have personal jurisdiction over any defendant.  They assert that

2   in its previous orders, the court merely found personal jurisdiction as to "defendants," and

3   that plaintiffs made no showing to justify a finding of personal liability as to any specific

4   defendant.  Defendants also argue that if plaintiffs cannot establish that Adoption Profiles

5   LLC is the successor in liability to, or the alter ego of, the Adoption.com partnership, they

6   cannot establish personal jurisdiction over Adoption Profiles LLC, and cannot obtain the

7   injunctive relief they seek.

8   *i.      successor liability*

9   Defendants assert that plaintiffs cannot establish successor liability because neither

10   Adoption Media LLC nor Adoption Profiles LLC is a successor to the Adoption.com

11   partnership.  Under California law, when one corporation sells or transfers all its assets to

12   another corporation, the latter is not liable for the debts and liabilities of the transferor

13   unless one of four exceptions applies:[13]

> (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts.

17   Ray v. Alad Corp., 19 Cal. 3d 22, 28 (1977).  Defendants argue that neither Adoption Media

18   LLC nor Adoption Profiles LLC falls within any of these exceptions to the general rule

19   against successor liability.

20   With regard to the first exception, defendants contend that there is no express or

21   implied agreement of assumption – that the partnership expressly retained liability, and the

22   transfer of assets from the partnership to Dale and Nathan and from Dale and Nathan to

23   the LLCs expressly disclaimed any intent to transfer liability.

24   With regard to the second exception, defendants contend that courts recognize de

25   facto mergers only when four conditions apply:

26   (1) there was a continuation of the enterprise of the seller in terms of

27   _____

28   [13]   Here, of course, it was the assets of the Adoption.com partners which were transferred to the LLCs.

United States District Court
For the Northern District of California

1
2
3
4

continuity of management, personnel, physical location, assets, and operations; (2) there is a continuity of shareholders [accomplished by paying for the acquired corporation with shares of stock]; (3) the seller ceases operations, liquidates, and dissolves as soon as legally and practically possible; and (4) the purchasing corporation assumes the obligations of the seller necessary for the uninterrupted continuation of business.

See Louisiana-Pacific Corp. v. ASARCO, Inc., 909 F.2d 1260, 1264 (9th Cir. 1990); see also Marks v. Minnesota Mining and Mfg. Co., 187 Cal. App. 3d 1429, 1436 (1986) (de facto merger where original business became a part of defendant, corporation ceased to exist, and result was the same as a statutory merger).  Defendants argue that this exception does not apply because the Adoption.com general partnership still exists and still has assets, and could readily pay any judgment for the minimum statutory damages at issue in this litigation.

With regard to the third exception, the "mere continuation" doctrine also requires that the selling entity dissolve – because only one corporation may remain after the transaction. Ferguson v. Arcata Redwood Co., LLC, 2004 WL 2600471 at *5 (N.D. Cal., Nov. 12, 2004); State of Washington v. United States, 930 F.Supp. 474, 478 (W.D. Wash. 1996).  As with the first exception, defendants contend that because the Adoption.com partnership still survives and has assets, there can be no successor liability under this exception.

With regard to the fourth exception, defendants contend that Dale and Nathan made no effort to escape liability for prior debts or actions, and that there can therefore be no question of any fraudulent purpose of escaping liability.

In opposition, plaintiffs assert that successor liability is an equitable doctrine, and that because of the great variety of factual circumstances in which successorship issues may arise, and because of the different legal consequences that may be at issue in different cases, no single, mechanical formula can be devised to resolve all successorship issues.  They argue that because the origins of successor liability are equitable, fairness is a prime consideration in its application.

Plaintiffs concede that many California courts have followed the four-part formulation set forth in the California Supreme Court's decision in Ray, but argue that courts working

United States District Court

For the Northern District of California

1   within that framework have applied the factors differently.  For example, they note, the court

2   in Franklin v. USX Corp., 87 Cal. App. 4th 615 (2001), observed that "the common

3   denominator, which must be present in order to avoid the general rule of successor

4   nonliability, is the payment of inadequate cash consideration."  Id. at 627.  Plaintiffs also

5   contend that some courts have gone outside the "traditional" exceptions, when the case

6   before them warrants another application of the equitable doctrine to reach an equitable

7   result.  They dispute defendants' suggestion that successor liability can never be imposed

8   in the context of partnerships, noting that courts have recognized the existence of

9   successors-in-interest to a partnership where the facts and equitable considerations

10  warrant such a finding.

11      Plaintiffs argue further that under the traditional successor liability standard,

12  Adoption Profiles and Adoption Media are liable.  They dispute defendants' assertion that

13  the "mere continuation" exception does not apply, and cite McClellan v. Northridge Park

14  Townhome Owners Ass'n, Inc., 89 Cal. App. 4th 746 (2001), for the proposition that

15  corporations cannot escape liability by a mere change of name or a shift of assets when

16  and where it is shown that the new corporation is in reality but a continuation of the old.

17      In McClellan, a condominium association failed to pay a contractor for repair work.

18  When the contractor commenced an arbitration proceeding, the condominium association

19  created a new homeowners association for the condo complex.  A court entered the

20  arbitration award for the contractor two weeks later, and the original condominium

21  association filed for bankruptcy two weeks after that.  The trial court amended the judgment

22  to include the new homeowners association, which appealed.

23      The appellate court found that the mere continuation exception applied and that the

24  new homeowners association was liable as a successor because it was a homeowners

25  association for the same condominium complex, because the same management company

26  remained in place, and because the new association derived its income from the same

27  source as the original condominium association – homeowner dues assessed to the

28  membership.  Id. at 756.  The court held that successor liability applied even though there

United States District Court

For the Northern District of California

was no evidence that the predecessor had been dissolved or had wound up its affairs.  Id.

Plaintiffs argue that in this case, Adoption Profiles LLC continues to offer the same profile posting service as the predecessor general partnership, operates the same website (ParentProfiles.com), and derives its revenues from the same source – the fee charged to prospective adoptive parents to use the profile posting service.  Plaintiffs claim that the ParentProfiles.com coordinator responsible for accepting and processing applications to post on the website was continuously employed in that position from January 2002 to November 2003 – first by the partnership, then by Adoption Media.  Plaintiffs assert that the fact that the partnership continues to own assets and develop new products is immaterial. They argue that the rule articulated in McClellan applies because the Gwilliams have attempted to frustrate plaintiffs' right to injunctive relief by a "mere change of name" and a "shift of assets" from the partnership to Adoption Profiles and Adoption Media, despite the fact that the new business entities are essentially but a continuation of the old.

Plaintiffs also assert that courts have applied the fourth Ray exception – the "fraudulent transfer" exception – to hold a successor business liable for the obligations of a successor when the transfer of assets occurs "for the fraudulent purpose of escaping liability."  Ray, 19 Cal. 3d at 28.  They claim that California courts have applied this exception when they find that a transfer of assets is undertaken to escape liability for a predecessor's existing or perceived future liabilities.

Plaintiffs claim that in the present case, defendants attempted to frustrate plaintiffs' statutory right to injunctive relief, by transferring the assets of the general partnership to two newly-formed limited liability companies.  Plaintiffs note that Nathan and Dale initiated formation of the LLCs and the asset transfers less than one month after responding to a letter from plaintiff's attorney, which had put them on notice of the potential for legal action to stop their discrimination against same-sex couples.  Plaintiffs claim that defendants have indicated their intent to evade liability by their assertions that Adoption Profiles LLC and Adoption Media LLC cannot be liable for discrimination because they did not exist at the time the events at issue in this case occurred.

United States District Court
For the Northern District of California

1    Plaintiffs argue further that because they seek an injunction to remedy an ongoing

2  discriminatory practice, the application of successor liability in the context of other

3  discrimination statutes is more apt than its application to claims for monetary relief.  They

4  contend that courts analyzing federal laws have held that prospective relief against a

5  successor is appropriate where the facts indicate that the successor will continue the

6  predecessor's practices, including where a successor will continue the predecessor's

7  practices, such as a violation of civil rights.  They also submit that the key component is

8  notice by the successor – in other words, while a business cannot be held liable for its

9  predecessor's liabilities if it did not assume those liabilities, it can be held to account for the

10  obligations of a predecessor where it had knowledge of unfair or discriminatory practices by

11  the predecessor.

12    The court finds that under the standard articulated by the California Supreme Court

13  in Ray, neither Adoption Media LLC nor Adoption Profiles LLC can be considered a

14  successor to the partnership.  There is no evidence of any express or implied agreement of

15  assumption of debts and liabilities; the conditions required to effectuate a de facto merger

16  do not apply; the LLCs cannot be considered a "mere continuation" of the Adoption.com

17  partnership because the partnership still exists in its previous legal form; and there is no

18  evidence that the Gwilliams transferred the partnership's assets to the LLCs for the

19  fraudulent purpose of escaping liability for the debts of the partnership.

20    The facts in this case are distinguishable from the facts in McClellan.  In McClellan,

21  the transfer and abandonment of the original homeowners association was deemed invalid

22  because it had not been accomplished with the required percentage of votes of the

23  membership.  The new association was therefore a mere continuation of the old because

24  while it was collecting dues from the condominium owners, it did not actually have any

25  members.  See McClellan, 89 Cal. App. 4th at 756.  Here, by contrast, the Adoption.com

26  partnership, which remains legally viable, sold or transferred assets including the

27  ParentProfiles.com website to the newly created LLCs.  While there may have been a

28  continuation of part of the enterprise of the partnership (the operation of

United States District Court

For the Northern District of California

1  ParentProfiles.com), the partnership itself was not dissolved and the LLCs did not assume

2  all of the obligations of the partnership.

3            ii.      *alter ego liability*

4        Defendants also argue that none of the defendants meets the requirements for alter

5  ego liability.  Under California law, a plaintiff seeking to invoke the alter ego doctrine must

6  establish two elements: that there is a unity of interest and ownership between the

7  corporation and its equitable owner such that the separate personalities of the corporation

8  and the shareholder do not really exist; and that there will be an inequitable result if the

9  acts in question are treated as those of the corporation alone.  Sonora Diamond Corp. v.

10  Superior Court, 83 Cal. App. 4th 523, 538 (2000).

11        The alter ego doctrine "arises when a plaintiff comes into court claiming that an

12  opposing party is using the corporate form unjustly and in derogation of the plaintiff's

13  interests."  Mesler v. Bragg Mgmt. Co., 39 Cal. 3d 290, 300 (1985).  The alter ego doctrine

14  prevents individuals or other corporations from misusing the corporate laws by the device

15  of a sham corporate entity formed for the purpose of committing fraud or other misdeeds.

16  Assoc. Vendors, Inc. v. Oakland Meat Co., 210 Cal. App. 2d 825, 842 (1962).  California

17  also applies the alter ego doctrine to LLCs.  See, e.g., People v. Pacific Landmark, 129 Cal.

18  App. 4th 1203, 1212 (2005).

19        Courts have identified a number of factors that may bear on the question whether

20  there is a unity of interest and ownership.  Although no single factor is dispositive, they

21  include

22
23        the commingling of funds and other assets; the failure to segregate funds of
          the individual and the corporation; the unauthorized diversion of corporate
          funds to other than corporate purposes; the treatment by an individual of
24        corporate assets as his own; the failure to seek authority to issue stock or
          issue stock under existing authorization; the representation by an individual
25        that he is personally liable for corporate debts; the failure to maintain
          adequate corporate records; the intermingling of individual and corporate
26        records, the ownership of all the stock by a single individual or family; the
          domination or control of the corporation by the stockholders; the use of a
27        single address for the individual and the corporation; the inadequacy of the
          corporation's capitalization; the use of the corporation as a mere conduit for
28        an individual's business; the concealment of the ownership of the corporation;

64

United States District Court

For the Northern District of California

1  the disregard of formalities and the failure to maintain arm's-length
2  transactions with the corporation; and the attempts to segregate liabilities to
   the corporation.

3  Mid-Century Ins. Co. v. Gardner, 9 Cal. App. 4th 1205, 1213 & n.3 (1992) (citation omitted).

4  Because no one factor governs, the court should look at all the circumstances to determine

5  whether the alter ego doctrine applies.  Sonora Diamond, 83 Cal. App. 4th at 539.

6       Defendants argue, however, that many of those factors do not apply in the case of

7  an LLC, because the members of the LLC are permitted by statute to actively participate in

8  the management and control of the company.  Defendants also argue that Adoption

9  Profiles LLC and Adoption Media LLC do not have a unity of ownership and interest with

10 each other or with the Adoption.com partnership, because Dale and Nathan own the

11 partnership, while True North and Aracaju own the LLCs.[14]

12      In addition, defendants contend that the business operations of Adoption Media LLC

13 and Adoption Profiles LLC are distinct, with Adoption Media LLC focusing on publishing

14 adoption-related information, and Adoption Profiles LLC focusing on publishing profiles of

15 potential adoptive parents for a fee, neither of which business interests are shared by the

16 Adoption.com partnership.  Defendants contend that cases that have found "unity" between

17 affiliated corporations have involved businesses that were engaged in a joint effort to

18 accomplish the same purpose.

19      Defendants also argue that alter ego liability cannot apply to True North and Aracaju,

20 because there is no evidence of self-dealing between the corporate defendants, the

21 Gwilliams, and the LLCs.  Defendants contend that the essence of the analysis is whether

22 the corporate owners have engaged in some sort of self-dealing to the detriment of the

23 plaintiffs, and argue that there can be no alter ego liability absent some bad faith.

24 Moreover, they assert, an inequitable result cannot be demonstrated merely by showing

25 that a plaintiff is unable to obtain the relief sought without piercing the corporate veil.

26      Defendants contend that there is no genuine issue of material fact regarding

27 _____

28      [14] However, True North and Aracaju are both closely-held corporations, as Dale
    Gwilliam and his wife own 100% of True North, and Nathan Gwilliam owns 100% of Aracaju.

United States District Court
For the Northern District of California

1   defendants' good faith.  They claim that the Gwilliams chose to form the LLCs and then

2   later, to incorporate, for legitimate business reasons, to avoid personal liability for future

3   corporate obligations, and for various reasons relating to estate planning.  They also

4   contend that the timing of the formation of the LLCs does not raise any inference of bad

5   faith, asserting that Dale Gwilliam, who is an attorney, attended a CLE seminar on tax

6   issues for LLCs in June 2002, some four months before plaintiffs attempted to post their

7   profile in October 2002, and also noting that Dale has stated in his declaration that he and

8   Nathan made the decision to begin operating as LLCs before September 2002.

9   Defendants also assert that when they decided to form the LLCs, and when they denied

10  plaintiffs' application to post their profile, they had no reason to believe that they were

11  violating California law, or that forming the LLCs or later incorporating would eliminate a

12  remedy (injunctive relief) that a potential claimant might have.

13          As for plaintiffs' assertion that Dale and Nathan's common ownership of the

14  Adoption.com partnership, the LLCs, and the corporations supports alter ego liability,

15  defendants argue that this claim is not supported by California law.  Defendants contend

16  that officers and directors of parent companies routinely serve as officers and directors of

17  subsidiaries.  They assert that corporate entities remain distinct, and argue that a parent

18  may be involved in the subsidiary's activities so long as that involvement is consistent with

19  the parent's investor status.  In sum, they contend that there can be no unity of ownership

20  between Aracaju and True North, as they are separately owned and have separate

21  interests – Aracaju being owned by Nathan, and True North being owned by Dale.

22          Finally, defendants argue that the alter ego doctrine cannot justify an injunction

23  against the LLCs or the corporate defendants for the Adoption.com partnership's alleged

24  violation of plaintiffs' rights.  Defendants assert that plaintiffs' total damages in this case are

25  the statutory minimum damages of $24,000, and that plaintiffs can easily recover that

26  amount from the partnership.  They contend that because Adoption.com no longer owns

27  the ParentProfiles.com website, and no longer engages in the behavior about which the

28  plaintiffs complain, it will not be possible for this court to grant any injunctive or other

United States District Court

For the Northern District of California

1  preventive relief against the partnership, because there can be no possibility of future injury

2  where the defendant has ceased owning the business.

3       Defendants contend that plaintiffs can seek injunctive relief only on the basis of

4  current, ongoing activities, and personal jurisdiction for that relief will have to be based on

5  something other than the contacts that the Adoption.com partnership had with California in

6  October 2002.  In a related argument, they assert that plaintiffs cannot obtain injunctive

7  relief against Adoption Media, True North, or Aracaju, because there is no evidence that

8  any of those defendants discriminated against plaintiffs.

9       In opposition, plaintiffs argue that the defendants are liable as alter egos.  They

10  contend that California courts state that there is no specific "litmus test" for identifying

11  whether an individual or entity is an alter ego of another, but that the main concern is

12  equity.  They argue that the equitable remedy of injunction is required in this case to

13  prevent an inequitable result for the plaintiffs.  They dispute defendants' claim that there

14  must be a finding of "bad faith" before liability can be imposed on a theory of alter ego.

15  They assert instead, that the doctrine is designed to prevent what would be fraud or

16  injustice if accomplished.

17       Plaintiffs contend that California courts have defined "inequitable result" to include a

18  situation where a corporate entity is used to evade the law or to accomplish some other

19  wrongful or inequitable purpose.  They argue that where a corporation is established to

20  avoid the effect of a statute, the court may look at factors including the strength of the

21  policy behind the statutory enactment.  They note that California courts have disregarded

22  the corporate form where an individual attempts to create multiple business entities to

23  evade coverage of a statute.

24       Plaintiffs dispute defendants' assertion that the doctrine of alter ego cannot apply

25  because the partnership still exists and can pay any judgment.  They note that defendants

26  rely on cases that sought only monetary damages from the alleged alter ego defendant.

27  They argue that plaintiffs can obtain complete relief in this case only by obtaining an

28  injunction.

**United States District Court**
For the Northern District of California

1    Plaintiffs argue that a finding of alter ego liability is appropriate where, as here, there

2   is common equitable ownership and control over all companies by the same individuals.  In

3   support, they cite Elliott v. Occidental Life Ins. Co. of Calif., 272 Cal. App. 2d 373 (1969).  In

4   that case, the court upheld the jury's finding that the Oroweat Baking Company of San

5   Francisco (a corporation) was an alter ego of the Oroweat Oakland Bakery (a partnership),

6   where the same three individuals owned all the stock in the corporation and also

7   constituted the three partners of the bakery.  All the baking was done by the San Francisco

8   company, and the Oakland company acted as the distributor.  Both companies were

9   represented by the same attorney, and the records and correspondence of both companies

10   was kept in the San Francisco office.  Both companies used the same employees and the

11   same business locations.  Id. at 375-77.

12    Plaintiffs assert that there is evidence that many of the relevant factors cited by the

13   Elliott court support a finding of alter ego in this case.  First, they note that Dale and Nathan

14   are each 50% owners of the partnership; that Dale and wife are the sole owners of True

15   North, and Nathan is the sole owner of Aracaju; and that Dale and Nathan are the

16   controlling owners of the sole corporate members of Adoption Media LLC and Adoption

17   Profiles LLC, giving them effective and exclusive control over both LLCs.

18    Plaintiffs also contend that the evidence shows, based on defendants' tax returns

19   and W-2 statements for employees, that defendants are located at the same business

20   address and share their employees.  Plaintiffs also assert that the ParentProfiles.com

21   development agreement details the symbiotic relationship between the two LLCs; and that

22   the defendants' internal financial documents (general ledger and balance sheets) reveal

23   that the entities share their assets and liabilities as a normal course of business, thus failing

24   to maintain arms'-length relationships among themselves.

25    Second, plaintiffs argue that Adoption Media, Adoption Profiles, True North, and

26   Aracaju were all undercapitalized at their formation.  Plaintiffs assert that the attempt to do

27   corporate business without providing a sufficient basis of financial responsibility to creditors

28   is an abuse of the separate entity and will be ineffectual to shield shareholders from liability.

United States District Court

For the Northern District of California

They argue that where a corporation is set up with insufficient capital to meet its debts, it would be inequitable to allow shareholders to escape personal liability by means of such a flimsy organization.  Plaintiffs assert that in light of the volume of business that defendants conducted, the initial capitalization ($100 from Dale and $100 from Nathan for each of the LLCs) was inadequate as a matter of law.

Third, plaintiffs also contend that during the first year that the LLCs were in operation, defendants touted ParentProfiles.com as part of the "Adoption.com Family," where millions of pages are visited each month," and Adoption Media LLC described the Adoption.com website as "the foremost authority for adoption on the Internet."

Fourth, plaintiffs argue that the Gwilliams themselves have disregarded distinctions among the various defendants, and failed to maintain adequate records because they and their employees confused the records of the separate entities.  For example, plaintiffs claim that the corporations' meeting minutes refer to Dale and Nathan in their individual capacities, rather than as representatives of True North or Aracaju; and that despite the alleged transfer of the membership of the LLCs into distinct corporations, the LLCs continued to list Dale and Nathan as "members" of those entities.  Plaintiffs also note that minutes of a special meeting of Adoption Profiles, LLC, held on January 21, 2003, refers to Adoption Media, LLC, in the body, and that defendants used the Tax ID number for the Adoption.com partnership to submit filings for Adoption Media LLC.

Finally, plaintiffs assert that the Gwilliams used the defendant business entities for their own personal economic benefit, treating the assets of the entities as their own.  Plaintiffs cite to an incident involving Dale Gwilliam, who attempted to use funds from Adoption Media LLC to pay a penalty assessed against him by the State Bar of Arizona.  However, plaintiffs note, because the matter to which the penalty related had occurred prior to the formation of Adoption Media LLC, he could not rightfully claim that Adoption Media should be paying fines incurred by its counsel.  Plaintiffs claim that this demonstrates Dale's willingness to use Adoption Media's assets as his own and to use them to settle his personal debts.

United States District Court

For the Northern District of California

1    Plaintiffs have provided some evidence suggesting a material dispute with regard to

2   whether there is a unity of interest and ownership among the Gwilliams and the entity

3   defendants, although the evidence that Dale and Nathan from time to time may have

4   disregarded the corporate formalities or disregarded distinctions among the entities is not

5   particularly compelling under the facts of this case.  Where a corporation is closely held, as

6   True North, Aracaju, and the LLCs appear to be, "the interests of the corporation's

7   management and stockholders and the corporation itself generally fully collide."  Gottlieb v.

8   Kest, 141 Cal. App. 4th 110, 151 (2006).  Moreover, lack of formality is not unusual in a

9   closely-held corporation.  See Nelson v. Anderson, 72 Cal. App. 4th 111, 125 n.7 (1999).

10    The Elliott case, however, is not persuasive authority.  Elliott involved an action on a

11   certificate of life insurance issued under a group policy, and neither of the Oroweat entities

12   was a defendant in the action.  Thus, the court noted, "[T]he situation is therefore not one

13   where the plaintiff was seeking to pierce the corporate veil and impose liability upon one

14   company for the acts of the other."  Elliott, 272 Cal. App. 2d at 376.  The court simply cited

15   the alter ego factors as support for its decision to reverse the judgment for the defendant

16   notwithstanding the verdict.

17    More importantly, however, the court finds that plaintiffs have provided no evidence

18   of bad faith, or evidence that Dale and Nathan created the LLCs or the corporations as

19   separate entities in order to avoid the operation of a statute.  Plaintiffs have not refuted

20   defendants' evidence that there was a legitimate business reason for the formation of the

21   LLCs, and later, the corporations.  In order to invoke the alter ego doctrine, plaintiffs must

22   demonstrate how the corporate structure was intended to deprive them of a right, or how it

23   has been used to do so.

24    Finally, to the extent that plaintiffs have raised triable issues with regard to alter ego

25   liability, the court finds that such disputed facts are not material, as plaintiffs have argued

26   that an inquiry into alter ego liability would be superfluous.

27    5.    Personal Jurisdiction

28    Defendants argue that the undisputed material facts show that the court does not

70

**United States District Court**
For the Northern District of California

1   have personal jurisdiction over any defendant.  Plaintiffs respond that the court has

2   repeatedly analyzed the issue of personal jurisdiction, and has ruled that sufficient

3   minimum contacts exist to establish both general and specific jurisdiction.  They argue that

4   defendants' motion does not identify any undisputed issues of material fact, or any case

5   law, that would warrant a different ruling on summary judgment.

6        California permits the exercise of personal jurisdiction to the full extent permitted by

7   due process.  Cal. Civ. Code § 410.10.  Absent one of the traditional bases for personal

8   jurisdiction (presence, domicile, or consent), due process requires that the defendant have

9   certain "minimum contacts" with the forum state, "such that the maintenance of the suit

10  does not offend traditional notions of fair play and substantial justice."  Int'l Shoe Co. v.

11  Washington, 326 U.S. 310, 316 (1945).  The extent to which a federal court can exercise

12  personal jurisdiction will depend on the nature and quality of presence, or the nature and

13  quality of the defendant's contacts with the forum state.

14       If the defendant's activities in the forum state are "substantial, continuous, and

15  systematic," a federal court can (if permitted by the state's "long arm" statute) exercise

16  jurisdiction as to any cause of action, even if unrelated to the defendant's activities within

17  the state.  Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 445 (1952).  This is

18  referred to as "general jurisdiction."  If a non-resident's contacts with the forum state are not

19  sufficiently continuous and systematic for general jurisdiction, that defendant may still be

20  subject to "specific jurisdiction" on claims related to its activities or contacts in the forum.

21  See Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d 1163, 1169 (9th Cir. 2006).

22       When a defendant moves to dismiss a complaint for lack of personal jurisdiction, the

23  plaintiff bears the burden of demonstrating that jurisdiction is proper.  Rio Properties, Inc. v.

24  Rio Int'l Interlink, 284 F.3d 1007, 1019 (9th Cir. 2002).  Where the motion is based on

25  written materials rather than on an evidentiary hearing, the plaintiff need only make a prima

26  facie showing of jurisdictional facts.  Schwarzenegger v. Fred Martin Motor Co., 374 F.3d

27  797, 800 (9th Cir. 2004).  In such cases, the court need only inquire into whether the

28  plaintiff's pleadings and affidavits make a prima facie showing of personal jurisdiction.  Id.

United States District Court

For the Northern District of California

1   Although the plaintiff cannot rest on the bare allegations of the complaint, uncontroverted

2   allegations in the complaint must be taken as true.  Id.  Conflicts between the parties over

3   statements contained in affidavits must be resolved in the plaintiff's favor.  Id.

4        Presenting a prima facie case of personal jurisdiction, however, does not necessarily

5   guarantee jurisdiction over the defendant at the time of trial.  Lake v. Lake, 817 F.2d 1416,

6   1420 (9th Cir. 1987).  If the pleadings or other declarations raise issues of credibility or

7   disputed questions of fact, the court may, in its discretion, order a preliminary hearing to

8   resolve the contested issues.  In that situation, the plaintiff must establish the jurisdictional

9   facts by a preponderance of the evidence.  Data Disc, Inc. v. Systems Tech. Assoc., Inc.,

10  557 F.2d 1280, 1285 (9th Cir. 1977).  Alternatively, the plaintiff must prove the jurisdictional

11  facts at trial by a preponderance of the evidence.  Id. at 1289 n.5.

12       The court previously found, in orders issued on May 3, 2004, on April 25, 2005, and

13  on March 13, 2006, that plaintiffs had established a prima facie case of personal

14  jurisdiction.  Nevertheless, defendants now assert that the previous rulings are to no effect

15  because the court failed to find personal jurisdiction as to each defendant, individually.

16  Defendants also contend that the previous rulings were made before the record in this case

17  was fully developed, and are not "evidence" and cannot be considered as such.

18       Plaintiffs argue in response that the court has repeatedly analyzed the issue of

19  personal jurisdiction, and has ruled that sufficient minimum contacts exist to satisfy both

20  general and specific jurisdiction.  They contend that the record is replete with evidence

21  supporting the court's exercise of personal jurisdiction over defendants as well as the

22  propriety of applying California law to this case.  They also assert that it is undisputed that

23  the court has jurisdiction over four of the defendants – Dale Gwilliam, Nathan Gwilliam,

24  Adoption.com (the partnership), and Adoption Profiles LLC.

25            a.   General Jurisdiction

26       For general jurisdiction to exist over defendants in this case, defendants must have

27  engaged in "continuous and systematic general business contacts" in the forum.

28  Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 416 (1984) (citing

72

United States District Court

For the Northern District of California

1 <u>Perkins</u>, 342 U.S. 437).  "This is an exacting standard, . . . because a finding of general

2 jurisdiction permits a defendant to be haled into court in the forum state to answer for any

3 of its activities anywhere in the world."  <u>Schwarzenegger</u>, 374 F.3d at 801.  In considering

4 whether it has general jurisdiction over a defendant, the court should look at all the

5 defendant's activities that impact the state, including whether the defendant makes sales,

6 solicits or engages in business in the state, serves the state's markets, designates an agent

7 for service of process, holds a license, or is incorporated there.  <u>Bancroft & Masters, Inc. v.</u>

8 <u>Augusta Nat'l Inc.</u>, 223 F.3d 1082, 1086 (9th Cir. 2000).

9          Defendants argue that no defendant has sufficient contacts for general jurisdiction.

10 They contend that the Adoption.com partnership and Dale and Nathan as general partners

11 currently have no substantial or continuous contacts with California, and have had no

12 contacts with California since the partnership distributed the Adoption.com and

13 ParentProfiles.com websites to Dale and Nathan in January 2003.

14          Thus, defendants assert, to the extent that the general partners or the partnership

15 ever had any substantial or continuous contacts with California, those contacts ceased,

16 never to be renewed, nearly eleven months before the present lawsuit was filed.  Based on

17 these facts, defendants contend that neither the general partners nor the partnership may

18 be subjected to general jurisdiction.  Defendants contend that the corporate defendants

19 likewise have had no contacts with California, and cannot be subjected to general

20 jurisdiction.

21          Defendants argue that Adoption Profiles LLC and Adoption Media LLC are the only

22 defendants with current contacts with California.  However, defendants assert, those

23 contacts cannot be deemed "continuous and systematic," as neither LLC has directed or

24 currently directs solicitations toward California businesses or residents.  Defendants claim

25 that the only advertising defendants do is directed at a nationwide audience, and assert

26 that advertisements over the Internet cannot be used to subject a business to general

27 jurisdiction.

28          In opposition, plaintiffs argue that the court has found general jurisdiction on

United States District Court
For the Northern District of California

1   numerous occasions, based on its analysis of the record evidence in the case.  They quote

2   at length from the court's previous order of May 3, 2004, denying the original defendants'

3   motion to dismiss, and the order of April 25, 2005, denying the original defendants' motion

4   for reconsideration of the portion of the May 3, 2004, order finding that plaintiffs had

5   established a prima facie case of personal jurisdiction; and also cite to the declarations filed

6   by plaintiffs in support of their oppositions to those motions.

7          They contend that the Internet-based activities of Adoption Profiles LLC are

8   sufficient to support general jurisdiction, given that those activities are targeted at California

9   residents and have resulted in contacts with California residents.

10                     *b.*     *Specific Jurisdiction*

11          Specific personal jurisdiction requires that the plaintiff make a three-part showing.

12  The plaintiff must show 1) that the out-of-state defendant purposefully directed its activities

13  toward residents of the forum state or otherwise established contacts with the forum state;

14  2) that the plaintiff's cause of action arises out of or from the defendant's forum-related

15  contacts; and 3) that the forum's exercise of personal jurisdiction in the particular case is

16  reasonable – that it comports with fair play and substantial justice.  Burger King Corp. v.

17  Rudzewicz, 471 U.S. 462, 477-78 (1985).  In addition, courts including the Ninth Circuit

18  have adopted a "flexible approach" that may allow personal jurisdiction with a lesser

19  showing of minimum contacts where dictated by considerations of reasonableness.  See

20  Ochoa v. J.B. Martin & Sons Farms, Inc., 287 F.3d 1182, 1188 n.2 (9th Cir. 2002).

21          The first requirement is that the defendant must have purposefully directed its

22  activities at residents of the forum, or purposefully availed itself of the privilege of

23  conducting activities within the forum state, thus invoking the benefits and protections of

24  local law.  Hanson v. Denckla, 357 U.S. 235, 253-54 (1958).  In examining "purposeful

25  direction" – most often used in cases involving tort claims – courts apply the "effects test,"

26  which requires that the defendant have 1) committed an intentional act, 2) expressly aimed

27  at the forum state, 3) causing harm that the defendant knows is likely to be suffered in the

28  forum state.  Schwarzenegger, 374 F.3d at 802-03; see also Panavision Int'l L.P. v.

United States District Court

For the Northern District of California

1   Toeppen, 141 F.3d 1316, 1320-22 (9th Cir. 1998).

2       Defendants contend that no defendant has sufficient contacts for specific jurisdiction.

3   They assert that plaintiffs' claims involve their October 2002 application to have their profile

4   posed on ParentProfiles.com, and the rejection of that application by Adoption.com and its

5   general partners.  Defendants contend that apart from this lawsuit, plaintiffs have never had

6   any contact with the LLC defendants or with the corporate defendants.  Thus, they argue,

7   there is no basis for a finding of specific jurisdiction over Adoption Media LLC, Adoption

8   Profiles LLC, True North, or Aracaju, or against Dale Gwilliam or Nathan Gwilliam as

9   officers, directors, or managers of those entities.

10      Defendants also argue there is no basis in the record for subjecting the

11  Adoption.com general partnership or its general partners to specific jurisdiction.  They claim

12  that there is no evidence that the partnership committed an intentional act, aimed at

13  California, which caused plaintiffs harm, or that the general partners knew was likely to

14  cause harm.  They assert that under Schwarzenegger, 374 F.3d at 804-05, general

15  foreseeability that an injury could occur in another state, standing alone, is insufficient for

16  the exercise of personal jurisdiction under the effects test.  They contend that under Yahoo!

17  Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme, 433 F.3d 1199, 1206 (2006), there

18  must be more than "mere untargeted negligence" to meet the effects test. They assert that

19  what plaintiffs are complaining about in this case is "mere untargeted acts," which

20  defendants argue is not the kind of activity necessary to satisfy the "effects" test.

21      Defendants concede that Dale and Nathan, as general partners of the Adoption.com

22  partnership, undertook numerous intentional acts that involved California, including

23  purchasing the Adopting.org website.  But they maintain that no intentional act expressly

24  aimed at California is the source of plaintiffs' injuries.  They argue that the act that caused

25  the alleged Unruh Act violation was an act of "considered decision, dictated by their

26  consciences and best judgment as to the best interests of children," to limit

27  ParentProfiles.com's customers to prospective parents who were heterosexual married

28  couples.

75

United States District Court

For the Northern District of California

1    Defendants claim that their refusal to enter into a contract is not the type of activity

2    necessary to satisfy the "effects" test.  They assert that while Dale and Nathan may have

3    undertaken numerous intentional acts that involved California, such as purchasing the

4    Adopting.org website, no intentional act expressly aimed at California is the source of

5    plaintiffs' alleged injuries.

6    Defendants contend that apart from this lawsuit, plaintiffs have never had contact

7    with the LLC defendants or the corporate defendants.  They also note that neither the LLC

8    defendants nor the corporate defendants existed in October 2002.  Thus, they assert, there

9    is no basis for a finding of specific jurisdiction over Adoption Media LLC, Adoption Profiles

10   LLC, True North, Aracaju, or Dale and Nathan Gwilliam in their capacity as officers,

11   managers, or directors of those entities.

12   Defendants also contend that plaintiffs have failed to show any "but-for" causation, to

13   establish specific jurisdiction.  In other words, they argue that plaintiffs have failed to

14   provide evidence showing that but for defendants' contacts with California, plaintiffs would

15   not have applied to ParentProfiles.com.  Defendants claim that the alleged Unruh Act

16   injuries could not have arisen out of the relationship between the Adoption.com partnership

17   and IAC, because IAC's recommendation that plaintiffs post their profile on

18   ParentProfiles.com was not based on a relationship with the Adoption.com partnership, and

19   because IAC did not actually recommend that plaintiffs post their profile on defendants'

20   website.

21   In opposition, plaintiffs argue that the court's previous findings continue to support

22   specific jurisdiction, again quoting from the May 3, 2004, and April 25, 2005, orders, and

23   citing to the declarations filed by plaintiffs in opposition to defendants' motions.  They

24   contend that the evidence referenced therein, as well as the evidence previously submitted,

25   supports the fact that defendants do more business in California than in any other state,

26   including Arizona.

27   Plaintiffs argue that the court has specific jurisdiction, because the original injury in

28   2002 arose out of plaintiffs' contacts with the Adoption.com partnership, Dale Gwilliam, and

76

United States District Court

For the Northern District of California

1 Nathan Gwilliam.  They assert that defendants discriminated against people they knew to

2 be California residents, and that defendants knew that the brunt of the injury would be felt

3 by them in California.  They contend that these injuries were not the result of plaintiffs'

4 unilateral overtures to the partnership and the Gwilliams, but rather were the result of

5 defendants' successful and deliberate attempts to solicit business from California residents

6 through California adoption agencies.

7 　　　　　Plaintiffs also contend that Adoption Profiles LLC is subject to specific jurisdiction

8 because its policy, from January 2003 to the present, has denied access to the Butlers and

9 other same-sex couples in California who would like to use the services of

10 ParentProfiles.com.  They argue that Adoption Profiles LLC simply continued the

11 discriminatory policy initiated by the Gwilliams while the Adoption.com partnership owned

12 the ParentProfiles.com website.  They claim that this intentional action was expressly

13 aimed at California.  As well, they assert that Adoption Profiles LLC encourages adoption

14 agencies located in California to recommend that prospective adoptive parents apply to be

15 listed on ParentProfiles.com, and has entered into agreements with California businesses,

16 including IAC.

17 　　　　　Plaintiffs assert that Dale and Nathan Gwilliam, as the sole officers and managers of

18 Adoption Profiles LLC, created and exclusively control the policies of the LLC.  They assert

19 that the Gwilliams' active participation in denying access to the Butlers and other California

20 same-sex couples makes them individually subject to personal jurisdiction for claims arising

21 out of that denial.

22 　　　　　　　　*c.*　　*Analysis*

23 　　　　　It is true, as defendants argue, that personal jurisdiction, if challenged, must be

24 established as to each defendant individually.  See Rush v. Savchuk, 444 U.S. 320, 331-32

25 (1980).  However, both the original defendants' motion to dismiss for lack of personal

26 jurisdiction and their motion for reconsideration of the order denying the motion to dismiss

27 for lack of personal jurisdiction referred throughout to "defendants' activities in California"

28 and "defendants' contacts with California."  Thus, the orders issued by the court on May 3,

United States District Court
For the Northern District of California

1   2004, and April 25, 2005, were also directed to the California activities and contacts of

2   "defendants."

3        Moreover, the May 3, 2004, and April 25, 2005, orders did address the contacts of

4   the individual defendants by implication.  That is, where the orders discussed jurisdiction

5   over "defendants" in connection with the events that occurred in late 2002 (rejection of the

6   Butlers' ParentProfiles.com application), the ruling applied to Dale Gwilliam and Nathan

7   Gwilliam, as the Gwilliams had not yet created the LLCs at that point.  Where the orders

8   discussed jurisdiction over "defendants" in connection with the post-2002 activities, the

9   ruling applied to the LLCs.

10       The ruling as to the Gwilliams can also be extended to the Adoption.com

11  partnership.[15]  The Gwilliams, as general partners in the partnership, developed and

12  implemented the "married-couples-only" policy.  In both California and Arizona, a partner is

13  an agent of the partnership when carrying on the business of the partnership in the usual

14  way.  Cal. Corp. Code § 16301(1); Ariz. Rev. Stat. § 29-1021(1).  For purposes of personal

15  jurisdiction, the actions of an agent are attributable to the principal.  Sher v. Johnson, 911

16  F.2d 1357, 1362 (9th Cir. 1990) (interpreting former Cal. Corp. Code § 15009(1), repealed

17  effective Jan. 1, 1999, and replaced with Cal. Corp. Code § 16301).  Thus, the actions that

18  warrant the exercise of specific jurisdiction over the Adoption.com general partnership, as

19  set forth in the earlier orders, were undertaken by the Gwilliams, as general partners.

20       Defendants argue, of course, that there can be no personal jurisdiction over the

21  Gwilliams and the Adoption.com partnership with regard to the October 2002 denial of

22  plaintiffs' application to post their profile on ParentProfiles.com, because the website was

23  transferred to Adoption Profiles LLC in January 2003.  Thus, according to defendants,

24  because the Adoption.com partnership no longer owned ParentProfiles.com when the

25  complaint in this action was filed in January 2004, the court cannot exercise jurisdiction

26

27       [15]  In their motion for leave to file the FAC, plaintiffs explained that at the time the
28  original complaint was filed, they were unaware that Adoption.com was both a website and a
     general partnership, and had not yet learned of the existence of True North and Aracaju.

United States District Court

For the Northern District of California

1  over the partnership.  The court declines to adopt this theory.  The court is satisfied, based

2  on the evidence heretofore provided, that it has jurisdiction over the partnership and the

3  general partners based on their activities vis-à-vis California prior to January 2003.

4       After plaintiffs amended the complaint, defendants again moved to dismiss for lack

5  of personal jurisdiction.  The motion filed by the original defendants (the Gwilliams and the

6  LLCs) and the motion filed by the Adoption.com partnership and Dale and Nathan as

7  general partners made essentially the same arguments they had made in the previous

8  motions and the same arguments they are making here – that neither Dale and Nathan

9  Gwilliam, nor the LLC defendants had sufficient contacts with California for general

10  jurisdiction; that plaintiffs could not establish specific jurisdiction over the original

11  defendants because the lawsuit did not arise out of those defendants' contacts with

12  California; that the LLC defendants could not be subject to specific jurisdiction because

13  they did not exist in October 2002; and that plaintiffs had not adequately pled alter ego

14  liability.  The motion filed by True North and Aracaju argued both that the court did not have

15  personal jurisdiction over the corporate defendants because the corporate defendants had

16  no contacts with California, and that plaintiffs had not adequately pled alter ego liability.

17       In its order filed March 13, 2006, the court denied the original defendants' motion

18  and the motion of the general partners on the ground that it had previously found that

19  plaintiffs had stated a prima facie case of personal jurisdiction.  The court denied the

20  motions of the partnership and the corporate defendants on the ground that plaintiffs had

21  established a prima facie case of alter ego liability.  Thus, the only defendants as to which

22  the court has not specifically found a prima facie case of personal jurisdiction are the

23  corporate defendants.

24       As the court has now found that summary judgment should be granted on plaintiffs'

25  alter ego and successor liability claims, the basis for finding personal jurisdiction over the

26  corporate defendants has evaporated.  Based on plaintiffs' failure to establish a prima facie

27  case of personal jurisdiction over True North and Aracaju, the court finds that those

28  defendants must be dismissed for lack of personal jurisdiction.

United States District Court

For the Northern District of California

1    With regard to the remaining defendants, apart from the analysis provided above,

2   the court is not inclined to again revisit the same arguments previously made by the

3   defendants.  Defendants describe their motion regarding personal jurisdiction as "not

4   technically a motion for [s]ummary [j]udgment."  Although they do not say what kind of

5   motion it is, the court is evidently meant to consider it as another Rule 12(b)(2) motion.

6    In the June 21, 2005, order regarding the plaintiffs' motion to strike the affirmative

7   defenses, the court denied the motion to strike the first through fourth affirmative defenses,

8   in which defendants alleged that the court does not have personal jurisdiction over,

9   respectively, Adoption Media LLC, Adoption Profiles LLC, Dale Gwilliam, and Nathan

10  Gwilliam.  The denial was based on the rule stated in Data Disk, – that even when a plaintiff

11  succeeds in making a prima facie showing of jurisdictional facts, "he must still prove

12  jurisdictional facts at trial by a preponderance of the evidence."  Data Disk, 557 F.2d at

13  1286 n.2.

14    Thus, the June 21, 2005, order directed defendants, no later than 60 days prior to

15  trial, to "submit a list of the alleged disputed facts or credibility considerations, which they

16  intend to present to the jury for determination on the factual aspects of" the dispute

17  regarding personal jurisdiction.  That order did not contemplate a renewal of defendants'

18  previous Rule 12(b)(2) arguments.  Accordingly, defendants motion as to personal

19  jurisdiction is DENIED, except as to True North and Aracaju.

20    6.    Objections to Evidence and Motions to Strike Evidence

21    The parties have submitted objections to evidence and motions to strike evidence.

22  The court has reviewed the objections, and finds that the evidence at issue appears to

23  have been submitted primarily in support of or in opposition to the motions for summary

24  judgment on liability under the Unruh Act, the motion for summary judgment on the claims

25  of alter ego and successor liability, or the motion to dismiss for lack of personal jurisdiction.

26  Because the court has not granted any of those motions in reliance on the disputed

27  evidence, the objections are OVERRULED.  Defendants have also objected to plaintiffs'

28  request for judicial notice, filed December 8, 2006.  That objection is also OVERRULED.

80

**CONCLUSION**

In accordance with the foregoing, plaintiffs' motion for summary judgment is DENIED; defendants' motion for summary judgment is GRANTED as to the claims under Business and Professions Code §§ 17200 and 17500; GRANTED as to the claims of alter ego and successor liability; and DENIED as to the claims under the Unruh Act. Defendants' motion to dismiss for lack of personal jurisdiction is GRANTED as to True North and Aracaju, and DENIED as to the remaining defendants.

The court will conduct a case management conference to discuss the trial schedule on Thursday, April 26, 2007, at 2:30 p.m.

**IT IS SO ORDERED.**

Dated:  March 30, 2007

_____
PHYLLIS J. HAMILTON
United States District Judge